**LAND et al. v. DOLLAR et al.**

No. 10956.

**SAWYER, Secretary of Commerce, v. DOLLAR et al.**

Nos. 10955, 10956.

United States Court of Appeals
District of Columbia Circuit.

May 18, 1951.

Gregory A. Harrison and Moses Lasky, San Francisco, Cal., for appellees-petitioners for sanctions for contempt.

J. Howard McGrath, Atty. Gen. and Holmes Baldridge, Asst. Atty. Gen., for respondents to petition for sanctions for contempt Sawyer, Fleming, Perlman, Ford, Hickey, Clapp, MacGuineas, Angell and Page. Charles Dickerman Williams, Solicitor, Department of Commerce, New York City, also appeared for respondents Sawyer, Fleming and Page.

Arthur B. Dunne, San Francisco, Cal., for respondent Killion.

Before CLARK, WILBUR K. MILLER and PRETTYMAN, Circuit Judges.

### Findings of Fact

1. Asserting that the transfer of shares amounting to 92 percent of the voting control of what is now American President Lines, Ltd., to the United States Maritime Commission, which occurred in 1938, was a pledge to secure indebtedness, and that, the indebtedness having been paid, the pledgors were entitled to have the pledged shares returned to them, the Dollar interests sued the then members of the Maritime Commission to recover possession.

The defense of the members of the Commission was that the 1938 transaction was

an outright transfer to the United States and that they held the shares in their official capacities as officers of the government; that the suit was therefore one against the United States to which it had not consented.

The Supreme Court held that the jurisdictional question depended upon the nature of the 1938 transaction: (a) if it was a pledge, the members of the Commission acted tortiously in retaining possession after the indebtedness secured thereby had been discharged, and so could be sued by the Dollar interests for a return of the property; (b) if it was a sale or other absolute transfer of title, the members of the Commission held the shares for the United States as the owner thereof and could not be sued for possession, absent the government's consent. The Supreme Court directed, therefore, that the lower courts determine the nature of the 1938 transaction, pointing out, however, that, while the determination of the question would settle the issue of possession, a decree that the transaction was a pledge only would not prevent the United States itself from asserting title as the government was not a party to the possessory action. Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209.

Subsequently, on July 17, 1950, this court held the transaction of 1938 was a pledge of the shares and not a sale; that, when the indebtedness secured by such collateral had been paid in full with interest, the pledgors were entitled to have the shares returned to them. Dollar v. Land, 87 U.S.App.D.C. 214, 184 F.2d 245.

Acting through Philip B. Perlman, Solicitor General, the former members of the Maritime Commission and their successor, Charles Sawyer, as Secretary of Commerce, petitioned for a writ of certiorari to review our holding. The Supreme Court denied the petition on November 13, 1950. Land v. Dollar, 340 U.S. 884, 71 S.Ct. 198.

We find as a fact, therefore, that since November 13, 1950, all the respondents here have known that a court of competent jurisdiction had finally adjudged that the transaction of 1938 was a pledge of the shares and that, if the members of the Maritime Commission or the Secretary of Commerce refused to surrender them to the pledgors after the indebtedness had been paid, they would hold them, not in their official capacities as agents of the United States, but as tort feasors acting in their individual capacities.

2. Respondent Charles Sawyer, acting on the advice of the Department of Justice respondents, continued nevertheless to hold possession of the shares and refused to surrender them to the pledgors, on the sole ground that the 1938 transaction was an outright transfer and not merely a pledge and that, therefore, Charles Sawyer in his official capacity was entitled to retain possession for the United States.

3. On December 11, 1950, the United States District Court for the District of Columbia entered an order on our mandate; and on December 15, 1950, notices of appeal to this court from that order were filed by the United States, the Secretary of Commerce, and the former members of the United States Maritime Commission. On January 31, 1951, we handed down an opinion in those appeals in which, as amended February 8, 1951, we directed the District Court to modify a portion of its judgment to read as follows:

"2. That plaintiffs are entitled to possession of the shares as against defendants,* and the defendants are ordered and directed to deliver forthwith to the plaintiffs the said shares. The possession to which plaintiffs are entitled is an effective possession of the shares. In so far as such right requires action on the part of defendants in addition to physical delivery of the certificates, such action is hereby directed to be taken. Plaintiffs are entitled under this judgment to all rights belonging to possessors of the shares. Plaintiffs are further entitled, as provided by Rule 70 of the Federal Rules of Civil Procedure, 'to a writ of execution or assistance upon application to the clerk' of this court, if such writ becomes necessary.

---

" * Plaintiff Dollar Steamship Line 2,-100,000 shares of the B stock and 2,075 shares of the A stock;

"Plaintiff R. Stanley Dollar 51,174 shares. of the A stock;

"Plaintiff The Robert Dollar Co. 37,722 shares of the A stock;

"Plaintiff H. M. Lorber 9,174 shares of the A stock."

We also noted that Charles Sawyer, Secretary of Commerce, had asserted in the District Court that he "holds custody of the stock which is the subject of this action" and with respect to him we said in the opinion:

"* * * The District Court is directed to enforce obedience to its order, as herein modified, whether effective process is against the present named defendants or is against another official, or other officials, against whom the order might be lawfully enforced if he or they were a party or parties to the suit. If the Secretary of Commerce now has custody or possession of the shares, he obviously acquired such custody or possession since the beginning of this action, indeed since the order of June 11, 1947. Obedience to the order about to be entered pursuant to this opinion is, therefore, enforceable against him, and he is liable, under Rule 71, supra, to the same process for enforcing obedience to that order as if he were a party."

On February 14, 1951, Emory S. Land, et al., former members of the United States Maritime Commission, and Charles Sawyer, Secretary of Commerce, filed a petition for a writ of certiorari to review our judgment of January 31, 1951. The Supreme Court denied that petition on March 12, 1951. Land v. Dollar, 340 U.S. 948, 71 S. Ct. 198.

On March 16, 1951, the District Court entered an order in the language which was prescribed by us, and implemented it by adding thereto the following:

"1. Said Charles Sawyer shall endorse each of said stock certificates in blank by signing thereon in the place provided for endorsement 'United States Maritime Commission, by Charles Sawyer, Secretary of Commerce.' And shall forthwith deliver them to the plaintiffs. Such delivery may be made to Moses Lasky, one of the plaintiffs' attorneys.

"2. If said Charles Sawyer delivers said certificates to plaintiffs or to said Moses Lasky, without having endorsed them, the clerk of this Court shall, at the request of any of the attorneys of the plaintiffs, endorse each of said certificates in blank, signing them 'United States Maritime Commission, by Harry M. Hull, Clerk of the United States District Court for the District of Columbia,' and shall attach to each of said certificates a certified copy of this order and a certified copy of the above order on mandate modifying final judgment and shall forthwith return said certificates to the plaintiffs through their attorneys.

"3. Said Charles Sawyer shall also forthwith by telegram instruct American President Lines, Ltd., its president, secretary and directors to transfer all the B stock, and 100,145 shares of the A stock of American President Lines, Ltd., to the plaintiffs in the amounts specified in the above mentioned order on mandate, and to make such transfers of record prior to said annual meeting.

"4. In the event the said Charles Sawyer fails by 9:00 A. M., on March 17, 1951, to give to the clerk and to plaintiffs' attorneys at Room 432 Shoreham Building, Washington, D. C., proof satisfactory to said attorneys that he has complied with the provisions of paragraph 3 above, the clerk of this Court shall forthwith give American President Lines, Ltd., its president, secretary and directors at 311 California Street, San Francisco 4, California, the following instructions and advice:

"That said American President Lines, Ltd., its president, secretary and directors are instructed to transfer all said shares of stock of record to the plaintiffs in the amounts specified in the said order on mandate, and to do so prior to the annual meeting of American President Lines, Ltd., on Monday, March 19, 1951; and

"The clerk shall give said advices and instructions by telegram or teletype so that they may reach their destinations prior to the said annual meeting on March 19, 1951. The clerk may give said instructions and advices by sending to American President Lines, Ltd., its president, secretary and directors by telegram or teletype a copy of said order on mandate and a copy of this order together with a statement that the instructions commanded to be given by

this paragraph 4 of this order shall be deemed thereby to have been given."

4. During the period beginning in December, 1950, and extending into March, 1951, the Department of Justice respondents (other than respondent Perlman), acting pursuant to the directions of the Attorney General, caused to be delivered to American President Lines, Ltd., to Wells Fargo Bank & Union Trust Company, and Joseph A. Tognetti, as transfer agents of the stock of American President Lines, Ltd., and to appellees, written notices and demands on behalf of the United States that the United States is the true and lawful owner of said stock, that said stock not be transferred on the books of American President Lines, Ltd., in the names of appellees, and that for any action taken by the persons to whom said notices were delivered in derogation of the title of the United States to said stock and certificates, said persons would be held strictly accountable to the United States.[1]

Respondent Clapp actually gave such written notices and demands by telegraph and by letter pursuant to the decision so to do made by the Department of Justice respondents. Those respondents thereby caused the company and its transfer agents to refuse to transfer on the company's books the certificates held by the Dollar interests endorsed by the clerk of the District Court.

5. The Department of Justice respondents advised respondent Sawyer that no more could properly be required of him in order to deliver effective possession of the shares to the Dollar interests "than for him to deliver physical possession of the stock certificates and, possibly, to endorse the certificates in his own name in his individual capacity (but not to endorse them in his official capacity as 'Secretary of Commerce')."[2]

Confirming and communicating this advice, on March 16, 1951, respondent Perl-man, then Acting Attorney General, advised respondent Sawyer by letter that he might deliver the stock certificates to the Dollars but that it would be prejudicial to the interest of the United States as owner of the stock for him to endorse the stock in the name of the Maritime Commission or to instruct American President Lines, Ltd., to transfer the stock on its books to the Dollars.[3]

6. Accordingly on March 16, 1951, the Secretary of Commerce delivered the certificates of stock but did not endorse them and did not give the instructions to the American President Lines, Ltd., which the District Court had directed him to give. On the contrary, Charles Sawyer, as Secretary of Commerce, executed on March 16, 1951, a proxy appointing A. J. Williams, Paul D. Page, Jr., and Lloyd C. Fleming as proxies for him to vote the shares of stock (certificates for which he had just surrendered pursuant to the court's order) at the annual meeting of stockholders of American President Lines, Ltd., to be held in San Francisco on March 19, 1951.

On March 18, 1951, another proxy was executed to the same three persons for use at the annual meeting of stockholders to be held on March 19, 1951, which was signed "United States Maritime Commission, by Philip B. Fleming, Acting Secretary of Commerce."

7. On March 19, 1951, the Department of Justice respondents (other than respondent Perlman), at the direction and with the approval of the Attorney General, caused to be filed in the action which had been instituted by the United States in the District Court for the Northern District of California a motion for a preliminary injunction "to enjoin the Dollars from asserting any rights as owners of the stock and to enjoin American President Lines and its transfer agents from recognizing the Dollars as owners by so registering them on its stock transfer books or otherwise."[4]

---

1. This paragraph is in the language of the respondents. It is from their Return to Order to Show Cause, p. 11.

2. Return of Sawyer, et al., to Order to Show Cause, p. 4.

3. Return of Sawyer, et al., to Order to Show Cause, p. 5.

4. Return of respondents to Order to Show Cause, p. 6.

This was done for the purpose of enjoining and preventing enforcement of the decision and mandate of this court herein by preventing the transfer of effective possession of said shares to the Dollar interests. Said California court has issued a preliminary injunction such as was sought by respondents.

8. The annual meeting of stockholders of American President Lines, Ltd., was held in San Francisco on March 19, 1951. Respondent Killion presided and respondents Page and MacGuineas were present. Attorneys for the Dollar interests were also present and read to the meeting excerpts from our opinion of January 31, 1951, 188 F.2d 629, and read in its entirety the District Court's order on mandate entered March 16, 1951. They presented proxies executed by the Dollar interests and demanded the right to vote the shares formerly in pledge. The transfer agent had declined to transfer of record the certificates which had been delivered to the Dollar interests by respondent Sawyer and which had been endorsed for the Maritime Commission by the clerk of the District Court.

Respondent Page [5] presented the proxies executed by Charles Sawyer, Secretary of Commerce, and by the United States Maritime Commission by Philip B. Fleming, Acting Secretary of Commerce. Respondent MacGuineas stated that he and respondent Angell appeared as attorneys for the United States. Inter alia, MacGuineas said: "On behalf of the United States I assert that the United States is the true and lawful owner of those shares and that it is lawfully entitled to vote those shares at this meeting, pursuant to the proxy given by the Secretary of Commerce, the duly authorized representative of the United States in that connection, and presented to your Secretary by Mr. Paul Page." (P. 30 of transcript.)

After referring to the motion for a preliminary injunction filed by the United States in the California proceeding, MacGuineas said: " * * * And therefore the United States feels assured of the vindication of its rights in that judicial proceeding and at this meeting asserts its right to vote the stock, the proxy of which [*sic*] has been submitted to you by Mr. Page."

Counsel for the Dollar interests took exception to the acceptance of the proxies executed by Sawyer and Fleming. With respect to that the following colloquy occurred at the stockholders' meeting:

"President Killion: Mr. Harrison, the officers and the directors of this corporation have been advised by our counsel, and in view of the conflict of orders which we have received we rely upon the District Court here for guidance and for instructions.

"Mr. Harrison: Rely upon whom, Mr. Chairman?

 * * * * * *

"President Killion: Upon the District Court in San Francisco.

"Mr. Harrison: And not the District of Columbia courts?

"President Killion: No. In San Francisco. For guidance and instructions. We have orders to do this and orders not to do it.

"Mr. Harrison: The orders not to are from the Attorney General's office?

"President Killion: From the Attorney General's office in Washington, D. C.

"Mr. Harrison: And the orders to do so are from the courts of the District of Columbia?

"President Killion: That is correct. * * *

 * * * * * *

"President Killion: Well, as I said earlier, Mr. Harrison, this corporation was

---

5. Footnote 29 on page 34 of the respondents' brief concedes the representative character of Page and MacGuineas. It is:

"29. Respondent Page was a subordinate and representative of respondents Sawyer and Fleming; respondent MacGuineas, who is a Department of Justice attorney, is a subordinate and representative of most, and in privity with all, of the Department of Justice respondents."

made a party to the suit filed in District Court here in San Francisco by the Department of Justice. Subsequently we received from the Attorney General in Washington, D. C. instructions that are contrary to the instructions received by [sic] the Clerk of the Court in Washington, D. C. So therefore, acting on advice of counsel here, the directors and the officers of this corporation proceeded to ask the court in San Francisco for guidance and for instruction. The United States government says on the one hand that if we act, we act at our peril; the Clerk of the District Court in Washington, D. C. requests us to take action which is diametrically opposite to the instructions or to the orders we received by [sic] the Department of Justice in Washington. In the meantime, you know of the action that has been taken here."

Respondent Page nominated the slate of directors furnished by respondent Killion and voted for them the shares under the Sawyer and Fleming proxies. He did this "pursuant to instructions from his superior officers in the Department of Commerce, and respondent MacGuineas, pursuant to instructions given him by his superior officers, the other Department of Justice respondents (other than respondent Perlman) * * *." [6] Respondent Killion declared Page's nominees elected.

Respondent Killion and the other respondents present at the meeting did not obtain guidance and instructions from the California court as to the conduct of the meeting, as Killion had said they would do, but proceeded with the meeting in accordance with instructions and orders of the Department of Justice respondents which were diametrically opposite to our decree and that of the District Court entered on our mandate.

9. From the foregoing it appears that, as charged in the order to show cause, the respondents asserted at the annual meeting of stockholders of the company on March 19, 1951, and still assert, that the Dollar interests are not entitled to the effective possession of said shares; and at the hearing

in said United States District Court for the Northern District of California on the application for said preliminary injunction respondents Angell and MacGuineas, speaking for themselves and all the respondents, declared orally and in writing that the plaintiffs are not entitled to the effective possession of said shares and that the decree of this court that they are so entitled was and is "a serious miscarriage of justice" and for that reason they have "declined to acquiesce" in it.

10. The respondents had full power and opportunity to cause the effective transfer and possession of said shares to the Dollar interests pursuant to the decree of this court but, in violation and defiance of this court's decree, respondents did not cause or attempt to cause the transfer of effective possession of said shares to the plaintiffs, but on the contrary actively and affirmatively prevented such transfer.

The by-laws of American President Lines, Ltd., provide that "the holder" of a certificate of stock which bears an authenticated endorsement is entitled to have the certificate transferred on the books of the corporation. Article VII, section 1, of the by-laws of American President Lines, Ltd., is in part as follows: " * * * The shares of stock in the corporation shall be transferable on the books of the corporation by the holder thereof in person or by his attorney, upon surrender for cancellation of a certificate or certificates for the same number of shares, with an assignment and power of transfer endorsed thereon or attached thereto, duly executed, and with such proof of the authenticity of the signature as the corporation or its agents may reasonably require."

11. From the foregoing findings it follows that, as charged in the order to show cause, respondents, on and after March 16, 1951, have asserted and stated on numerous occasions that respondent Charles Sawyer, as Secretary of Commerce, is lawfully entitled to maintain effective possession of said shares and to vote and exercise all of the rights of the possessor thereof, notwithstanding the decision of this court and

6. Return of respondents to Order to Show Cause, p. 7.

the final judgment herein entered; and pursuant to said assertions respondent Sawyer has unlawfully maintained and continues to maintain an effective possession of said shares.

12. On March 19, 1951, the Dollar interests registered in the District Court for the Northern District of California the judgment entered March 16, 1951, by the District Court for the District of Columbia under the provisions of 28 U.S.C.A. § 1963. On March 21, 1951, the Dollar interests filed a petition in the California court for an order to show cause in civil contempt, specifying alleged contempts substantially similar to those specified in the show cause order entered by this court. The judge of the California court discharged the show cause order, holding there was no contempt. Respondents here contend that the dismissal of the contempt charges by the California District Court is binding and conclusive and constitutes a bar to the contempt proceedings now before us.

13. All action by the Department of Justice respondents or any of them, hereinabove described, was done pursuant to the approval and directions of their respective superior officers in the Department of Justice, including respondent Ford. Respondent Sawyer did not surrender effective possession of the shares to the Dollar interests, as our decree ordered him to do. The failure to comply fully with our decree and to surrender effective possession of the shares, and the prevention of the transfer thereof of record, resulted from the several acts and omissions of various respondents hereinbefore described, and from the concerted action of the Department of Justice respondents in advising him and respondent Killion to disobey our decree, and of respondents Sawyer, Page and Killion in accepting such advice and acting in accordance therewith.

14. Respondent Perlman took no action in connection with the charges stated in the order to show cause other than to sign, as Acting Attorney General, the letter to Charles Sawyer, Secretary of Commerce, in which he advised the Secretary to surrender the certificates as ordered by the District Court but advised him to disobey the District Court's order to endorse the certificates and to instruct American President Lines, Ltd., to transfer them of record. Accordingly, all references here to the Department of Justice respondents are to be construed as including all such respondents except respondent Perlman.[7]

## Conclusions of Law and Order

1. The suit filed by the Dollar interests to recover possession of the shares of stock in question, which the members of the Maritime Commission held under the claim that they were owned by the United States, presented two basic justiciable issues. Those issues were whether the United States owned the shares, and whether the Dollar interests were entitled to possession; and the answer to the latter depended upon the answer to the former.

Our decision of July 17, 1950, with respect to which certiorari was denied by the Supreme Court, was that the shares were not owned by the United States, that the Secretary of Commerce therefore did not hold them in his official capacity, and that the Dollar interests were entitled to possession. This final decree was enforceable against the Secretary of Commerce under Rule 71, Federal Rules of Civil Procedure, 28 U.S.C.A. It then became the duty of respondent Sawyer to surrender possession, and coercion to that effect should not have been necessary. Charles Sawyer as Secretary of Commerce could not and did not hold the shares after the pledge was discharged. Charles Sawyer, the private individual, never had the right to hold them.

The assertion of the respondents, and their action based on the assertion, after our decree of July 17, 1950, that the Secretary of Commerce had the right to retain possession of the shares, was disobedience of and resistance to that decree.

2. The respondents had the power to cause the certificates to be endorsed as directed, and to cause American President Lines, Ltd., to transfer the shares and to

7. Return of respondents to Order to Show Cause, p. 11.

issue certificates therefor to the Dollar interests, thus surrendering effective possession as our decree had ordered.

3. The acts of the respondents in causing the certificates to remain unendorsed by the Maritime Commission or its successor, the Secretary of Commerce, and in causing American President Lines, Ltd., and its transfer agents to refuse to transfer the shares and to refuse to issue certificates to the Dollar interests, and their other acts described in the foregoing findings of fact, constituted disobedience of and resistance to our decree of January 31, 1951, as amended, and the District Court's order on mandate entered March 16, 1951.

4. The Dollar interests were entitled, under our decree, to complete and effective possession of the shares. Respondent Sawyer's continued retention of possession was not and is not essential to the government's maintenance of its suit to try title, and is not justified or excused by the respondents' contention otherwise.

5. In its California suit to try title to the shares, the United States had no right to and no need for injunctive relief which would override and nullify our final decree. By seeking and obtaining a preliminary injunction with that purpose and effect, the respondents disobeyed and resisted our decree.

6. After the Secretary of Commerce had delivered the certificates of stock to the Dollar interests, even though unendorsed, he had no legal right to execute the proxy which he did execute with respect to such shares. Philip B. Fleming had no legal right to execute the proxy which he did execute with respect to such shares after the certificates therefor had been surrendered by the Secretary, endorsed by the clerk of the District Court, and delivered to the Dollar interests. Their acts in so doing were in disobedience of and resistance to the final decree of this court.

7. The fact that the District Court's order on our mandate directed the clerk of that court to endorse the certificates if respondent Sawyer did not do so, and to give the prescribed instructions to American President Lines, Ltd., its president, secretary and directors, if respondent Sawyer had failed to do so by 9:00 a. m. on March 17, 1951, did not relieve respondent Sawyer of the affirmative duty of endorsing the certificates and of giving the prescribed instructions to American President Lines, Ltd., its president, secretary and directors, or of securing by other action the delivery of effective possession of the shares as he was directed to do by the court's order.

8. The fact that only those shareholders whose shares had been of record on February 26, 1951, would be entitled to vote at the annual meeting of the stockholders on March 19, 1951, did not confer the legal right to vote at such meeting upon respondent Sawyer or his proxies because Sawyer was not legally in possession of the shares at the time of the annual meeting.

9. That the respondents may have believed in good faith that our decrees were erroneous did not justify them in disobeying or resisting them. Those decrees, like any other final judicial order, were to be precisely and promptly obeyed by all against whom they were enforceable, no matter how erroneous they may have been. No person can make himself the judge of the validity of a final judicial decree and, by his own act of disobedience, set it aside. United States v. United Mine Workers of America, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884; Howat v. Kansas, 1922, 258 U.S. 181, 42 S.Ct. 277, 66 L.Ed. 550; Gompers v. Buck's Stove & Range Co., 1911, 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797; In re Sylvester, D. C. S.D.N.Y. 1930, 41 F.2d 231.

10. Effective possession of these shares of stock will have been delivered to the Dollar interests when those interests have been recorded in the books of the American President Lines, Ltd., as the holders of the shares, and certificates evidencing such stockholdings have been delivered to them.

11. The official status of the respondents does not immunize them from punishment for contempt. Government officials are bound to obey the judgment of a court just as are private citizens, and their be-

634

lief that the judgment is wrong, no matter how great their good faith in entertaining such belief, cannot justify them in disobeying, or resisting enforcement of, the judgment unless and until it has been set aside or reversed on appeal. In re Sylvester, D. C. S.D.N.Y.1930, 41 F.2d 231.

■ 12. Respondent Killion, who, as president of American President Lines, Ltd., was a creature of respondent Sawyer, deliberately chose to follow the orders and instructions of his co-respondents, and to disobey and resist the decree of this court. The fact that he was not a party to this suit does not justify or excuse his disobedience and resistance nor protect him from punishment therefor. Cassidy v. Puett Elec. Starting Gate Corp., 4 Cir., 1950, 182 F.2d 604; Harford Agr. & Breeders' Ass'n v. Puett Elec. Starting Gate Corp., 4 Cir., 1950, 182 F.2d 608, certiorari denied 340 U.S. 878, 71 S.Ct. 125, rehearing denied, 1950, 340 U.S. 898, 71 S.Ct. 237.

■ 13. By virtue of 18 U.S.C.A. § 401 this court has summary power to punish by fine or imprisonment, at its discretion, contempt of its authority when that contempt consists of "Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

14. This court, having directed the United States District Court for the District of Columbia to enter a judgment on mandate in terms prescribed by it, has the power to punish for contempt those who disobey or resist the order on mandate so entered by the District Court. Merrimack River Sav. Bank v. City of Clay Center, 1911, 219 U.S. 527, 31 S.Ct. 295, 55 L.Ed. 320; Toledo Scale Co. v. Computing Scale Co., 1923, 261 U.S. 399, 43 S.Ct. 458, 67 L.Ed. 719.

■ 15. Disobedience of or resistance to our decree constitutes contempt of this court, no matter where the act of contempt was committed. Leman v. Krentler-Arnold Hinge Co., 1932, 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389.

16. This court had jurisdiction to enter orally on April 6, 1951, its rule to show cause and to enter formally in writing on April 10, 1951, its rule to show cause.

■ 17. The registration of the judgment of the District Court for the District of Columbia in the District Court in California gave the latter court no power to deal with the judgment except to enforce it. The decision of the California court that the respondents here were not in contempt there could not and did not foreclose this court from proceeding with the present contempt proceeding, and its judgment of no contempt is not res judicata here.

18. It is considered and adjudged that, because of their acts and omissions described in the foregoing findings of fact, the respondents, Charles Sawyer, Peyton Ford, Newell A. Clapp, Edward H. Hickey, Donald B. MacGuineas, Philip B. Perlman, Philip B. Fleming, George L. Killion, Philip Angell and Paul D. Page, Jr., are, and each of them is, guilty of civil contempt of this court.

■ 19. Respondent Perlman may purge himself by rescinding his advice to the Secretary of Commerce to disobey this court's decree and the implementing order of the District Court, and by advising the Secretary of Commerce to comply forthwith, fully and effectively, with the decree.

■ 20. The other Department of Justice respondents may purge themselves by withdrawing the contemptuous advice and instructions which they have given to respondents Sawyer, Killion and Page, and to American President Lines, Ltd., its secretary, directors and transfer agents, and by advising and instructing that the decree of this court be complied with immediately, fully and effectively; and by taking whatever steps are necessary to relieve American President Lines, Ltd., and its stock transfer agents of the preliminary injunction issued by the District Court in California which prohibits American President Lines, Ltd., and its stock transfer agents from transferring on the corporate records the shares represented by the certificates presented by the Dollar interests.

The respondents will not be heard to say it is beyond their power to accomplish this. If it is necessary to do so in order to remove the restraint of the preliminary in-

junction, the Department of Justice respondents can dismiss without prejudice the suit to try title which they instituted in the name of the United States in the California District Court, and can then immediately re-file it.

21. Respondent Sawyer may purge himself by endorsing on the certificates "United States Maritime Commission, by Charles Sawyer, Secretary of Commerce," and by causing respondent Killion, American President Lines, Ltd., and its transfer agents to transfer the shares to the Dollar interests on the corporate books and to issue certificates to them.

22. Respondent Killion may purge himself by causing American President Lines, Ltd., and its stock transfer agents to transfer the shares of record to the Dollar interests and to issue to them certificates therefor.

23. It is suggested in respondents' brief that, since the issuance of the order to show cause herein, respondent Page has resigned from his position in the Department of Commerce and no longer has an official status. If that be made to appear by affidavit, respondent Page will be excused from purging himself of the civil contempt of which he is guilty, since he will have no power or authority to aid the other respondents in the effectuation of our decree.

24. The respondents will be given until 3:00 p. m., E. D. T., May 24, 1951, to purge themselves of the civil contempt of which they are guilty. They are hereby ordered to present themselves before this court in the courtroom of the United States Court of Appeals Building, 5th and E Streets, Northwest, Washington, D. C., at that hour and day, unless prior to that time they shall have presented to the court evidence that they have fully and effectively obeyed the decree and the court has found such evidence to be adequate. Or they may present at the time of their appearance evidence that they have fully and effectively obeyed the decree, which evidence the court will immediately examine for adequacy. If evidence of compliance is not presented to the court at or before the time thus fixed or, if presented, the evidence shall be found by the court to be inadequate, respondents will then be committed to custody to remain in confinement until they have fully and effectively complied with the decree.

Proof of compliance which does not show that American President Lines, Ltd., has issued and delivered to the Dollar interests certificates evidencing the shares in question will not be regarded as adequate.

Opinion.

PER CURIAM.

We have rendered four opinions upon various phases of this litigation. 1951, 88 U.S.App.D.C. ——, 188 F.2d 629; 1951, 88 U.S.App.D.C. ——, 190 F.2d 366; 1946, 81 U.S.App.D.C. 28, 154 F.2d 307; 1950, 87 U.S.App.D.C. 214, 184 F.2d 245. The question now before us is whether the respondents, Sawyer, et al., should be subjected to punishment, for either criminal or civil contempt, for failure to comply with the decree of this court on the merits of the controversy. We are today filing our findings of fact and conclusions of law upon that question. We need not here repeat what we said there. But some contentions urged by respondents require further comment.

The decree of this court was entered January 31, 1951. 188 F.2d 629. Petition for certiorari was denied by the Supreme Court, 340 U.S. 948, 71 S.Ct. 533. Pursuant to our mandate the District Court, on March 16, 1951, entered the decree we had directed it to enter. On March 20th a petition that we impose sanctions for contempt was filed. Oral hearing was had on April 4th, at which time this court inquired whether respondents would then comply with the decree. Respondent Sawyer replied that he believed the decree had been fully complied with but that, if this court were of the view that he could and should take further action, he would so comply, in so far as he is able, with any mandate issued by this court; with the reservation that such action must be in his personal capacity, not as an officer of the United States. Respondents other than Sawyer replied, in respect to the California proceeding, that

they respectfully maintained their right to apply for injunction against the transfer of the shares on the books and against the voting of the stock by the Dollars. Points of law were raised by respondents. Oral hearing was again had on April 6th. Respondents were asked, in open court, if they would take steps to suspend action in the District Court in California until this court could receive briefs and hear argument upon the legal points presented. Their counsel replied in effect that this would not be done. A rule to show cause was issued orally by this court on April 6th and formally in writing on April 10th, returnable April 12th. On that date oral hearing was again had, and an opinion stating in detail the reasons which impelled the court to issue the rule was read. At the suggestion of the Attorney General the return date was extended to April 23rd. Oral hearing was had again on that date, April 23rd. Responses to the rule were filed that same day. Time to amend the responses was extended to April 30th. On May 2nd time to file briefs on the legal points was extended to May 9th. Briefs were filed on that day.

The responses admit the basic facts alleged by the petition to have occurred, and seek to justify or explain them.

Respondents earnestly, emphatically and repeatedly assert that they have neither done nor said anything contemptuous or defiant of the court. They insist that what they have done has been well within the permissible limits of action protective of rights claimed in good faith. The court has given full weight to those expressions in refraining from imposing penalties for criminal contempt. But neither good faith nor difference of opinion as to the correctness of the court's judgment can sustain continued refusal to comply with the decree.

A basic fact in the pending phase of this proceeding must be emphasized and kept constantly in mind throughout the entire consideration. That fact is that, so far as these respondents are concerned, their claim to possession of these shares of stock has been adjudicated adversely to that claim in a final decree.

Respondents' counsel say that "Of course, the Supreme Court has never passed upon the merits of the issue." But the Supreme Court twice denied petitions for certiorari in which the respondents sought to have that Court review and reverse the decree of this court. A Supreme Court decision is not necessary to make an order of a court binding or finally dispositive of a controversy. If an order of a District Court is not appealed it is just as final in this sense as if the Supreme Court had itself entered the order. An order of any court having jurisdiction of the parties and of the subject matter is binding. It may not be *res judicata* as to other parties, but it is conclusive as to the parties before the court. By the utmost offered by our established processes of judicial consideration, the decree of this court has become final in respect to these parties, their privies, etc., and in respect of this controversy. Of course, even if the decree were not final, it would have to be obeyed unless it were stayed by further order of a court of competent jurisdiction. But in the instant case these respondents have been finally ordered to yield possession of these shares. That basic fact must be kept in mind as every contention now made by respondents is examined.

Two propositions run through the whole of respondents' contentions. One is that this litigation was against Sawyer's predecessors as individuals, whereas they held the shares in their official capacities as agents of the United States and on its behalf, and he holds the shares in that same capacity. The other proposition is that, if upon suit of a citizen a court of competent jurisdiction finds certain property to be his, and orders the Government officials who have possession to deliver the property to him, those officials may legally refuse to deliver possession if the impersonal Government of the United States asserts an unadjudicated claim to the title to the property. Both propositions are erroneous.

I

Respondents say that they have been guided by the principle that this litigation was against the members of the Commis-

sion in their individual capacities and not as officers and agents of the United States. This leads them to conclude, in effect, that the decree of the court meant that the Dollar interests were entitled to possession of the shares as against Charles Sawyer but not as against Charles Sawyer, Secretary of Commerce; and they assert that Sawyer held and holds the shares as Secretary of Commerce.[1] Obviously that conclusion would nullify any decree granting possession to the Dollars. We think the Supreme Court did not mean any decree in the litigation to be futile. It said, concerning this case, " * * * petitioners, being members of the Commission, were in position to restore possession of the shares which they unlawfully held." [2]

Let us examine what was presented to the Supreme Court in this respect in this case and what it held. The Court said that the Dollars claimed that the members of the Maritime Commission were unlawfully in possession of their stock. The Court said that the allegations of the complaint, if proved, would establish that those members were unlawfully withholding the Dollars' property under the claim that it belonged to the United States. Thus, the alleged factual situation and the issues were clearly depicted. The members of the Commission had possession of the property. They claimed that it belonged to the United States, and the Dollars claimed that it belonged to them. The next question was whether the courts have jurisdiction to resolve that conflict in claims. The Court held, upon authority of the Lee case,[3] that the courts do have such jurisdiction. The next question was what result would follow from a decree in favor of the Dollars. The Court was quite specific about that. It held that the force of the decree would be to grant possession to the Dollars. It said, as we have quoted above from the opinion, that the members of the Commission were in position to restore possession of the

shares. What possession were they to restore? Obviously whatever possession they had.

Respondents say that the Supreme Court was dealing with a possession in the members of the Commission as private individuals, apart from their offices. Then they say that the real possession in those members was in them as officials. So, they argue, the members could retain possession in spite of the court decree, because the Supreme Court did not mean that they must deliver official possession (which they assert was the possession they had) but meant that they should deliver an individual-personal possession (which in fact they did not have). Such reasoning ascribes to the Supreme Court opinion a futility which we decline to accept.

This contention of the respondents presses a matter of phraseology much too far. It was held by the Supreme Court in Larson v. Domestic & Foreign Commerce Corp.[4] that, where an official of the United States holds property outside the scope of his official authority, he holds it in his "individual capacity". The Court meant, as it made abundantly clear, that in such case the official can be required by court order to yield possession. It used the term "individual capacity" to describe a capacity in which the official may be reached by court decree. It meant to describe a possession which a court can require an official to yield. It did not use the term to create a schizophrenia in one person in respect to the same property. Respondents would have us hold that if a court determines that an official holds property "in his individual capacity" he need not yield possession if in his own view he does not hold any such possession or holds it in some other capacity. The Supreme Court did not mean that. It did not mean to give to a claim by an official, precedence and control over a court decree; especially where that very claim

---

1. Charles Sawyer came into possession of the shares during the course of the litigation when the Maritime Commission was abolished and its members left office. He holds them exactly as the members of the Commission held them.

2. Land v. Dollar, 1947, 330 U.S. 731, 737, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209.

3. United States v. Lee, 1882, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171.

4. 1949, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628.

has been rejected by valid court judgment. It should be added that throughout the opinion in the Larson case the Court carefully pointed out where this present case, referring to it by name, fitted into the reasoning of that opinion. It there repeatedly affirmed what it had already held in respect to this case.

Moreover, although of less importance, Sawyer did deliver to the Dollars the physical possession of the certificates. We do not attempt to untangle the anomaly of that action in the light of his contention otherwise. It seems to us that if he could, in his individual capacity, as he construes the term "individual capacity", take the certificates physically from himself, as Secretary of Commerce and hand them over to the Dollars, he could deliver possession of the shares themselves by the same intermanual movement. Respondents say, "Respondent Sawyer, Secretary of Commerce, in executing the proxy to vote said stock * * * did so, not in his individual capacity, but in his capacity as Secretary of Commerce"; and they say, "Respondent Sawyer in his individual capacity has yielded effective possession to appellees, as herein stated." We make no attempt to harmonize those two statements as reflections of the possession which the Secretary says he had.

We conclude on this point that when a court determines that an official holds property of a citizen in an "individual capacity", it means that he can be required by court decree to yield whatever possession he has; he cannot yield one kind of possession (individual) but keep another kind (official) and thus retain effective possession of the property.

## II

Respondents say that they are immune from punishment for contempt in the present case. They draw that conclusion from two premises. They say that public officials are not accountable in the courts for their official acts; that their immunity from suits for damages applies with equal force to contempt proceedings. And they say that the orders they received from their superior executive officials afford complete protection against contempt charges.

In the course of the argument upon this point, respondents limit each statement to "official acts", "acts done within the scope of their official authority", "acts done in their official capacities". When they state the argument in that fashion they gather support from decided cases in so far as damage suits and suits for injunctions are concerned. But the statements thus phrased have no applicability to the present case, because, we point out again, it has been finally determined by the courts that these particular respondents do not hold this particular property in their official capacities as agents of the United States. However, we must assume that respondents mean their argument to apply to the present proceeding; that they do not intend to make a theoretical argument of no purpose. Thus viewed their proposition contradicts a fundamental concept of constitutional government.

Let us once more cast the proposition in terms of the present case. A person who is an officer of the Federal Government holds property which a citizen claims to be his. The official says that he holds on behalf of the United States, and as its agent. The citizen brings suit against the official. The courts determine that the property belongs to the citizen, that the official does not hold it on behalf of the United States, that the official is in wrongful possession of the citizen's property, and they order the official to return the property to the citizen. Respondents say that the courts cannot compel the official to deliver the property to the citizen. In effect they say that the citizen is helpless and the courts are impotent.

Respondents say repeatedly that the courts cannot "coerce" executive officials, using that term to apply to the present proceeding.

The matter reaches to bedrock. The initial premise of the American form of government is that the rights of life, liberty and property are inherent in the people. The Government was established by the people, and its powers were enumerated

in a written document. The Government has no other powers. In order that neither the legislature nor the executive might exceed those conferred powers, a third, co-equal branch of government was established. It was not necessary to make the judiciary a co-equal branch of government in order to provide a tribunal for the adjudication of ordinary disputes between citizens; in almost all governments there are courts for that purpose. But it was necessary to make it such a third branch in order that there might be a tribunal with power to determine whether specific acts of the legislature or of the executive are within the powers conferred by the people in the written document.

■ It is absolutely true that if an act be within the powers conferred upon the legislature the judiciary cannot interfere with it in any fashion; and, similarly, if an act be within the power of the executive the judiciary cannot coerce it, restrain it, or interfere with it in any degree. But some authority must determine whether a specific act is within the official capacity of the executive and so immune from interference. That authority is the judiciary. That question is a justiciable issue. The Constitution put the power of determination of such a question in the judiciary, because it was necessary to put it there. It being necessary in the scheme of a constitutional government to have an authority to decide such a question, the authority to be effective had to be lodged in a separate independent branch of the government co-equal with the branches over whose activities it was to have this power.

Respondents say that, even though the courts determine that a specific action is not within the official capacity of an executive officer, he is immune from compulsion by the courts in respect to that action. That is to say that the executive can determine for himself whether the acts of his subordinate officials are within or without their official capacities. That proposition asserts the impotency of the judiciary as an organ of government.

■ The true rule is that if a case or controversy is justiciable the courts have power to decide it; that, having power to decide, the courts have power to compel obedience to their decree; that the power to decide whether an issue presented to them in a case or controversy is or is not justiciable belongs, by the necessities of the constitutional plan of government, in the judiciary. In the present case the courts have decided that the Commission and the Secretary did not and do not hold these shares on behalf of the United States as its agents. The court has power to enforce that judgment in so far as the Secretary and the members of the Commission are concerned. The executive branch of the Government has no power in the face of that judgment to decide that the Secretary does hold the shares as agent of the United States. To claim that the executive has such power is to claim the total independence of the executive from judicial determinations in justiciable cases and controversies. To characterize such judicial determinations as illegal coercion of the executive is to deny one of the fundamental concepts of our government.

Respondents say that they followed directives of their superiors. They show that the President wrote Secretary Sawyer, "Accordingly, you are directed to continue to hold this stock on behalf of the United States." That is what the respondents have done; they have continued to hold the stock. And that is what the court ordered them not to do.

We think that whoever advised the President misconstrued the legal posture of the controversy. The difficulty, as we see it, is that respondents, both in advising the President and in planning their own course, have persistently failed to recognize the difference between title and possession and the difference between a claim and an established right.

■ Title and possession are different rights, although usually correlative. One may have title without possession or possesisson without title. It is true that an established title usually carries with it the right to possession. But a mere claim to title does not carry a right to possession as against a person in lawful possession. The United States does not have an established

title to these shares; it has merely a naked unadjudicated claim. The Dollars have a legally established right of possession. So the issue is simply: Can a person with an unadjudicated claim to title lawfully continue to hold possession after a valid court order has directed him to deliver the property to another? The answer must be "No"; a mere claim to property cannot effectively nullify a court order.

Let us test respondents' contention by two suppositions. Suppose the United States had a claim to property which had never been in its possession or in the possession of any of its agents. Surely its claim would lose little merit by reason of that fact. Or, from the opposite angle, suppose the United States never brought suit to establish its title but merely insisted upon asserting its unadjudicated claim. Surely it could not thereby permanently defeat a decree for possession. The idea that in some fashion a yielding of the possession of these shares would impinge upon the claim of the United States to title is wholly untenable.

The course open for respondents, obeying the court and at the same time protecting the title claim of the United States, was and still is perfectly clear. It was to deliver fully effective possession of the shares to the Dollars and then bring a suit, if they wished, on behalf of the United States to establish its title; and, if it then appeared that some contemplated action of the Dollars would in some way damage the property pending the title litigation, the court could be requested to protect the property against such damage.

The right to maintain status quo is mentioned several times in the responses. What status quo? In compliance with or in defiance of a validly entered court decree? It is perfectly clear that if "status quo" is an apt phrase in respect to such a situation the preservable status is that existing after the court decree has been obeyed. Preexisting status cannot be resuscitated, even by directives of superior executive officials, after a court has fixed a new status.

■ We conclude on this point that respondents are not immune from compulsion to obey the decree of the court; that they are accountable for their acts, since the capacity in which they acted in this matter was a justiciable question and has been adjudicated; that the directives of superior executive officials cannot nullify the court decree, and, moreover, those directives stemmed from a misunderstanding of the effect of possession upon an unadjudicated claim to title.

### III

Respondents say that the right of the United States, referred to in the Lee case, supra, to injunctive relief *pendente lite* in the suit to quiet title means that, despite the order of this court directing Sawyer to deliver possession, another court upon application of the United States can direct him to retain it. We think that the ancillary remedy cannot be used as a direct nullification of a final decree of a court.

The argument of the respondents is stated thus: "And if the United States is not bound by the District of Columbia judgment, all of its agents and officials are likewise free to press *its* rights. This is no less true because some of those officials are, as individuals, held to be bound by the District of Columbia judgment. It is as if the prior defendants were not government officers at all."

■ The Supreme Court has repeatedly laid down the rule that a citizen may recover through court action possession of property wrongfully withheld from him by an official of the Government. The rule is not in the Lee case, supra, alone, but in many others.[5] That rule is a valueless nullity if the United States, upon merely asserting a claim to title in another court, is entitled to an order precisely and explicitly forbidding surrender of that very possession by that very official. The strong statements of the Court relative to the

---

5. Summarized in Tindal v. Wesley, 1897, 167 U.S. 204, 17 S.Ct. 770, 42 L.Ed. 137, and in the opinions in the Larson case, supra.

rights of the citizen and the effect of a decree in an action for possession do not permit that conclusion. Thus the Court has described the Lee case in this language:[6] "The judgment in that case did not conclude the United States, as the opinion carefully stated, but held the officers liable as unauthorized trespassers, and turned them out of their unlawful possession."

The only valid conclusion is that, no matter what rights the United States has, the officers whose possession has been judicially held unlawful are by that judgment turned out of possession. There is no doctrine in our jurisprudence which permits a specific and direct nullification of one court's final judgment by another court (not in the line of appellate process), in so far as the parties to that judgment are concerned, assuming, of course, that the first court had jurisdiction and that there was no fraud.

The difficulty with respondents' position is that they identify themselves with the Government of the United States in the face of a judicial judgment that they are not agents of the United States in respect to this property.

What we have already said about "status quo" applies here.

We think it is clear that the only ancillary injunctive relief to which the United States is entitled in its suit to quiet title, is relief which recognizes the existing decree and is preceded by accomplished compliance with that decree.

## IV

Respondents say that this court has no jurisdiction to enforce a decree entered by the District Court, even though it was entered by our direction *in haec ver-*

*ba.* That the power to punish summarily in order to enforce obedience to its orders, judgments and decrees is vested by the statute in this court is clear from the statute and was settled by Ex parte Robinson.[7] The statute reads:[8]

"A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

"(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

"(2) Misbehavior of any of its officers in their official transactions;

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

There is no doubt that the statute of 1831, from which Section 401, Title 18, of the United States Code, just quoted, was derived, curtailed the power theretofore exercised by the courts in respect to contempt.[9] But the curtailment lay in the first clause, dealing with contemptuous acts, etc., in the presence of the court. We are not here concerned with that clause. We are concerned with the third clause, which confers summary power to punish for disobedience of a decree or order.

Respondents say, as they must in their effort to sustain their point on jurisdiction, that the decision in Toledo Scale Co. v. Computing Scale Co.[10] "is no longer good law". They reach that conclusion by reasoning that the premise of that decision was the first clause in the statute, "concerning misbehavior which obstructs the administration of justice"; that that was the premise of the decision in Toledo Newspaper Co. v. United States;[11] and that, therefore, when the latter case was overruled by Nye v. United States,[12] Toledo

---

6. Cunningham v. Macon & B. R. R. Co., 1883, 109 U.S. 446, 452, 3 S.Ct. 292, 297, 27 L.Ed. 992, 994.

7. 1874, 19 Wall. 505, 86 U.S. 505, 22 L. Ed. 205.

8. 62 Stat. 701 (1948), 18 U.S.C.A. § 401.

9. Nye v. United States, 1941, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172; In re Michael, 1945, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30.

10. 1923, 261 U.S. 399, 43 S.Ct. 458, 67 L. Ed. 719.

11. 1918, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186.

12. 1941, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172.

Scale Co. v. Computing Scale Co. was also overruled.

Toledo Scale Co. v. Computing Scale Co. did not concern the first clause of the statute in any respect. It concerned disobedience of a decree, dealt with by the third clause. There is not the slightest intimation in Nye v. United States that the overruling of Toledo Newspaper upon the construction of the first clause of the statute had any effect upon Toledo Scale Co. v. Computing Scale Co.

Toledo Scale Co. v. Computing Scale Co. held that when a District Court enters an order by direction of a Circuit Court of Appeals, and that order is disobeyed, the Circuit Court of Appeals has power to punish summarily for the disobedience. In that case the order of the District Court was in the words of the Circuit Court of Appeals, as is the case now before us. And the punishment there was in civil contempt, as is the order now being entered in the present case. We are of opinion that the decision in Toledo Scale Co. v. Computing Scale Co. is not only "good law" but is a binding authority upon the point. If it is not the law, Courts of Appeals are impotent in respect to decrees which they formulate and direct a District Court to enter.

## V

Respondents say that they complied with the decree as they construed their rights and duties to be. Their expressions, among others, are: "with the sole purpose of protecting what they conceive to be the interests of the United States"; "as they have in good faith construed such [this court's] decisions and mandates"; "consistent with the belief of respondents"; "as such interests have been conscientiously conceived by respondents"; "as that phrase [effective possession] has been interpreted in good faith by these respondents".

The proposition thus advanced by the respondents amounts to this: If the court orders a person to perform an act, but he in good faith conceives it to be his duty not to perform it, he need not perform it. Merely to state the position is to refute it. The cases on the point are numerous and unanimous. The Supreme Court stated the rule unequivocally in the Mine Workers case.[13] Even if the decree be eventually set aside as erroneous, it must be obeyed while it is outstanding, the Court there said. When the second Mine Workers case[14] was before this court, the Department of Justice told us that the salutary effect of the rule of law was epitomized in a statement by Mr. Justice Frankfurter in the first case,[15] quoting the statement as follows: "It does not mitigate such defiance of law to urge that hard-won liberties of collective action by workers were at stake. The most prized liberties themselves presuppose an independent judiciary through which these liberties may be, as they often have been, vindicated. When in a real cnotroversy, such as is now here, an appeal is made to law, the issue must be left to the judgment of courts and not the personal judgment of one of the parties. This principle is a postulate of our democracy."

We agreed with that statement then, and we must agree with it now. A mere financial interest in a commercial transaction, which is all that is involved in the present case, is not so compelling a stake as were the hard-won liberties of the mine workers, involved in that case. If the latter stake was not sufficient to justify the exercise of a personal judgment at variance with a court decree, a fortiori the former is not. It is not for respondents to construe their duty to comply or not to comply with a court decree.

13. United States v. United Mine Workers of America, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884.

14. International Union, etc., v. United States, 1949, 85 U.S.App.D.C. 149, 177

F.2d 29, certiorari denied, 1949, 338 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535.

15. Supra note 13, at 330 U.S. 311, 67 S.Ct. 704.

## VI

Respondents insist that these shares belong to the United States. The Secretary, in his separate response, explains his actions in respect to these shares, after the decree of the court was entered, by saying that the stock belongs to the citizens of the United States. A similar idea was expressed by the District Court in California. Since that precise claim has been adjudicated to the contrary, so far as the Secretary is concerned, and since that decree, whether valid or not, must be obeyed, the claim now repeated is immaterial in the present proceeding. But our study of this portion of the responses reveals that this claim is inconsistent with the actions of the Secretary and his predecessors in possession, the members of the Maritime Commission.

Under the Constitution[16] the power to make all needful rules and regulations respecting property belonging to the United States is conferred upon the Congress. Sometime about 1940 Congress began a study of corporations owned in whole or in part by the United States. A Committee of the Senate made a series of reports on the subject. In its report dated August 1, 1944,[17] the Committee listed all corporations in which the Government owned a proprietary interest, in whole or in part. It did not list as such a corporation the American President Lines, shares in which are the property here involved. In the report, it referred to that company and this stock and said that the shares had been acquired by the Maritime Commission, and commented upon the possibility of "bringing about private ownership of the lines at an appropriate time." The Commission, as Congress knew, was authorized by statute "to protect, preserve, or improve the collateral held by the Commission to secure indebtedness".[18] Congress had before it complete reports on the transaction whereby the Commission had acquired possession of these shares. On December 6, 1945,

Congress enacted a statute which provided: "It is declared to be the policy of the Congress to bring Government corporations and their transactions and operations under annual scrutiny by the Congress and provide current financial control thereof."[19] It provided for wholly-owned corporations[20] and then provided for "mixed-ownership Government corporations",[21] meaning corporations in which Government capital was invested. It listed those corporations, but the list did not include the American President Lines. The statute provided that such corporations should be audited annually by the General Accounting Office and that a report of the audit should be made annually to Congress, including statements of income and explanations of expenditures.

No audit of the books of the American President Lines appears ever to have been made by the General Accounting Office, and no annual reports of that company appear to have been made to the Congress. In fact, the reports of the Comptroller General concerning the Maritime Commission clearly indicate that he had never audited the books of the American President Lines. The annual report of the company in the papers before us shows the audit of the accounts was by a private concern.

Under those circumstances two views are possible: (1) That Congress considered the acquisition of the shares by the Commission just as this court eventually held it to be; i. e., an acquisition by way of pledge for security of a loan. Upon that understanding Congress would not include the steamship company on its list of corporations in which the United States owned a proprietary interest. (2) That Congress intended to make one single exception to its general legislation concerning the financial control of corporations of which the United States is part owner. It is inconceivable to us either that Congress intended to make one

16. Art. IV, § 3, cl. 2.

17. Sen.Doc.No.227, 78th Cong., 2d Sess.

18. Sec. 207 of the Merchant Marine Act, 49 Stat. 1988 (1936), as amended, 52 Stat. 954 (1938), 46 U.S.C.A. § 1117.

19. 59 Stat. 597, 31 U.S.C.A. § 841.

20. 59 Stat. 597, as amended, 31 U.S.C.A. §§ 846–852.

21. 59 Stat. 600, 31 U.S.C.A. §§ 856–859.

single exception to its policy and program on this subject or that, if it intended to make such an exception, it would not say so.

Let us then look at the contentions of respondents in the light of the actions of the Commission and the Secretary. They contend that for some twelve years, since 1938, the United States has owned outright these shares. During that time they (*i. e.*, first the members of the Commission and then the Secretary) have, by voting that stock, selected and elected a board of directors. The gentlemen thus selected are not Government officials. Of the nine directors, six are eminent businessmen in private business and three are officials of the steamship company. If the United States was the outright owner of these shares in the corporation (92% of the control), it is strange that it did not have a single official representative on the board.

The directors have exercised control over the affairs of the company. They have fixed its salaries, directed its expenditures, hired its employees, bought ships, managed assets said to total some $68,000,-000, determined freight and passenger services, and disposed of, by investment and expenditure in the business, some $30,000,-000 of earnings. They have done all this without control except by the body or person (the Commission or the Secretary) who appointed them, without an audit by the General Accounting Office, and without a report to the Congress. No such condition obtains anywhere else, so far as we can ascertain, in respect to property of the United States. The whole course of action since 1938 is consistent with the idea that the Commission and the Secretary held control of these shares in order to protect money loaned by the United States to this company, but is wholly inconsistent with and untenable upon the theory that the shares were and are property of the United States. The contentions presently made that the shares are property of the United States are thus inconsistent with an unvaried course of action for twelve years, inconsistent with enactments by the Congress relative to corporations in which the United States owns capital, and inconsist-

ent with the declared policy of the Congress that the Merchant Marine of this country shall be privately owned.

It is inconceivable to us that Congress intended to put some $30,000,000 of earnings belonging to the people of the United States into the hands of private persons, and to permit those private persons to pay such salaries as they pleased to such persons as they pleased, to buy such property as they pleased for such prices as they pleased, without audit by the Comptroller General and without annual reports to the Congress. In no other instance that we have discovered has Congress dealt thus with property of the United States; certainly not since its study of the subject and the act of 1945 which followed it.

There is not the slightest hint in any congressional pronouncement that Congress intended to nationalize the outstanding trans-Pacific ship company. The Government has operated various private industries upon occasion for some compelling public reason. It operated the railroads for a time and the coal mines several times. But no agency of the Government has ever contended that by virtue of such operation the property became the property of the United States. So, in the present case, the debts due the United States by the steamship company made advisable the operation of the Lines by the Commission, just as debtor difficulties often require operation by a receiver on behalf of the creditor. But the nationalization of an industry or a company is a totally different matter. It is to be undertaken only upon the most explicit authorization and direction of the Congress. There is no such authorization or direction in this instance.

It must constantly be remembered that the United States does not say it paid anything whatever for this stock; as a matter of fact it did not. The acquisition was described in a single sentence by the Comptroller General in his 1950 report to the Congress concerning the Maritime Commission. He said: "The Commission acquired this stock under an agreement dated August 15, 1938, in consideration of releasing R. Stanley Dollar and the Dollar Steamship Lines (California) from all

liability as makers, co-makers, guarantors, or endorsers on the mortgages on 12 ships purchased from the United States Shipping Board in 1923 and 1925." [22]

That sentence is a clear and unmistakable description of a substitution of one sort of security (negotiable paper collateral) for another (personal guaranties) upon a loan. [23] That is what we held it to be.

## VII

The course pursued by the Government in this matter strikes hard at the doctrine of sovereign immunity from suit. That doctrine had a philosophical basis in a monarchic government. But it is a mere rule of convenience in a jurisprudence revolving about a democratic constitutional form of government. It has a valuable place of public importance in that jurisprudence. But it should not be permitted to thwart fundamental principles of greater importance. For example, Congress has already consented to suit in respect to contracts and some kinds of torts. It is well established that a Government official cannot wrongfully hold property of a citizen by merely claiming to be acting for his sovereign; that claim, we iterate, is subject to judicial examination and judicial determination. When the determination is that the claim of official authority is not well taken, the rule that the judgment is not *res judicata* against the impersonal Government gives rise to difficulty. It is true that the rule serves a useful purpose when the Government has a point of law or of fact not presented or not presentable in the litigation between the citizen and the official. But the case at bar is not such a case. The United States does not claim any circumstance not already litigated. It claims that the transaction in 1938 was an outright acquisition and not a pledge. That claim has been litigated. It claims that the officials who held and hold the shares act in their official capac-

ities as its agents. That claim has been litigated in a suit to which those same officials were parties. The claims were presented by the same Department of Justice which will now present them in the new proceeding in California. The United States does not allege that its claim now to be presented for adjudication in the new action involves any new or different point of fact or law. It merely claims that the judgment already entered by this court is in error. Thus the rule of *non res judicata* is not being used to secure the adjudication of an unadjudicated point, but is made the vehicle for the relitigation of adjudicated points.

The Government can always enter a suit. There is no rule or policy which prevents it from submitting its claims to a court. It says in the present case that it can exercise its privilege of non-submission until the litigation has been concluded and then, if the result be adverse, enter another court and relitigate the issues. Under the established rules it has precisely that right, but no one could contend that those rules serve any useful purpose under such circumstances. Whether the value of such relitigation outweighs its grievous burden of expense and time, its studied purpose to create a conflict between judicial determinations upon the same facts and the same law, and the value of finality to orderly judicial processes is a serious question.

It may well be that the rule of *non res judicata* should give way when it serves no practical purpose, when the facts, the persons, and the law in the proposed relitigation are identical with those in the litigation finally concluded by decree. But it is not for this court to attempt to create a variation to the rule as established by the Supreme Court. And it is indisputably true that the claim of the United States to title is immaterial to the claims of Sawyer, et al., respondents in this suit, to pos-

22. H.R.Doc.No.465, 81st Cong., 2d Sess. 59 (1950).

23. In that report the Comptroller General said that the Commission "owned" the stock, stating that the District Court had so held but that the matter was then pending on appeal. In his current Report on the Audit of Federal Maritime Board and Maritime Administration, Etc. (H.R.Doc.No.93, 82d Cong., 1st Sess. 98 (1951)), the Comptroller says that the Secretary of Commerce is "holder" of the stock.

session. Thus, this discussion of the *non res judicata* rule and the impact of the Government's course upon the doctrine of sovereign immunity is outside the scope of any issue before us. At the same time, if the claim of the United States involved a point not litigated here, and if immediate delivery of the property to the Dollars might involve eventual irreparable damage to the United States if it established its title, we might be impelled to exercise our discretion and stay our decree pending that litigation. That possibility justifies this part of our discussion. We find no such situation in this case. The fact that the new litigation pictured to us in these papers involves no new law, person or circumstance bears upon our decision not to stay our hand in the enforcement of our decree. In the Toledo Scale Co. case, supra, the Supreme Court pointed out that the absence of a new point in the Ohio case was a proper consideration by the Seventh Circuit Court of Appeals in its decision not to stay its hand in enforcing its decree.

## VIII

Respondents defend each separate bit of action taken by them. They defend upon various grounds the failure to endorse the certificates, the execution of the proxies, the failure to recognize the Clerk's endorsement, the recognition of the Secretary's proxies, and the bringing of the lawsuit in California. What they fail to justify is the sum total of their acts and their failures—the failure to deliver effective possession of the shares. That is what the court directed. That is what they have not done.

Respondents say that they are not certain what "effective possession" means. They know what shares in a corporation are—the undivided proprietary interests in its assets. The remainder of the question must be answered in terms of the case before us. Generalities of almost any conceivable effect concerning stock and stockholders can be gleaned from the law books. But generalities get us nowhere in our problem. Two parties are interested, the Dollars and the United States. The Dollars are the lawful possessors of the shares. So much

has been judicially determined. The United States has an unadjudicated claim to title to the shares. Its title has not been established. It has never been the record stockholder. No certificate has ever been issued in its name. The record stockholder is the Maritime Commission, which no longer exists. The possession of the shares by the members of that Commission has been judicially determined to be wrongful and illegal. The Dollars have established to the satisfaction of a court that they are the rightful owners of the shares, excepting only that the conclusion is not *res judicata* against the right of the United States to litigate its claim.

So the problem is: Present a lawful possessor of shares of stock, with valid title except for an unadjudicated claim of another, what rights has the lawful possessor?

There is no doubt whatever, in our view, that under these circumstances the person in lawful possession of the shares is entitled to be registered on the records as a stockholder and to have certificates issued to him. And he continues to have those rights until the opposing claimant has established his title. One person has submitted his claim to judicial determination, and the other has not. It is untenable to maintain that the former can have no rights upon his judgment because the latter has thus far declined to submit his claim to a court.

We need go no further than the by-laws of the corporation the shares in which are here involved, for verification of our view. Article III, Section 4, refers to "The holders of record of a majority of the issued and outstanding shares." Article VII, Section 1, provides: "The interest of each stockholder of the corporation shall be evidenced by a certificate * * *. The shares of stock in the corporation shall be transferable on the books of the corporation by the holder thereof * * *." And Section 4 of that Article provides that "The corporation shall be entitled to treat the holder of record of any share or shares of stock as the holder in fact thereof * * *." Thus, the by-laws themselves treat of "holders" of the shares, and give a "holder" the right to transfer the shares on the books.

Surely there is no doubt that the Dollars are by court decree the lawful holders of the shares.

 Respondents seem to exaggerate the effect of the doctrine of *non res judicata*. That doctrine does not mean that the judgment is invalid or incomplete. The judgment is *stare decisis* even though not *res judicata*. The doctrine simply means, in respect to a stranger to a case, that in a subsequent contest the prior judgment is not decisive upon the stranger's claims. That is all that the rule of *non res judicata* as to the United States means in the present case. It means merely that if, in the suit of the United States to quiet title, the Dollars should counter with a plea of *res judicata*, they could not prevail on that ground. The Dollars might not even plead it; it is an affirmative defense under the Rules.[24] If the United States chose never to bring a suit, the Dollars would be the permanent holders of the shares. Their stockholding would not be imperfect because of the outstanding potential claim. The judgment which the Dollars have is not *res judicata* as to any other stranger to the record in this litigation; and exactly to the same extent as the rule applies to the United States. But to say that a judgment lacks some element of effectiveness merely because it is not *res judicata* as to all persons strangers to the record is a wholly untenable statement. The judgment is valid and enforceable to the full extent of its terms until the stranger establishes his right. That must necessarily be the law, because otherwise no judgment would be enforceable.

The Dollars have a valid and complete judgment against those persons who were in possession of the shares. They are entitled to the full effectiveness of that judgment, until and unless the United States, which like numberless others was not a party to the suit, establishes the right which it claims.

We conclude upon the point that the Dollars are entitled to be entered as the lawful stockholders of record for these shares and to be issued certificates for them. Those steps are necessary, in our opinion, to constitute effective possession of the shares.

When and if respondents had made a bona fide objective answer to the question of the meaning of "effective possession" and had complied with that answer, they would have been in a position to say that they did not know what further they should do. As it is, they have done nothing. They have yielded to the Dollars nothing except paper certificates the endorsement upon which they decline to recognize. They "declined to acquiesce" in the decree of this court, as they told the court in California. They "continue to hold the stock", as they were directed by their superior officers to do. They leave us no alternative but to compel obedience to our decree.

We are constrained to remark in conclusion that this court is a United States court, just as much part of the Federal Government as are the Department of Justice and the Secretary of Commerce. The Constitution placed upon the federal courts, of which we are one, the duty and responsibility of deciding controversies between citizens and officials claiming to act as agents of the sovereign government. There is nothing new in the difficulties of that position. It has existed at least since the English judges began to assert the supremacy of the common law over government absolutism. The Supreme Court had this to say on the subject in the Lee case:

"The slightest consideration of the nature, the character, the organization, and the power of these courts will dispel any any fear of serious injury to the government at their hands.

"While by the Constitution the judicial department is recognized as one of the three great branches among which all the powers and functions of the government are distributed, it is inherently the weakest of them all.

"Dependent as its courts are for the enforcement of their judgments upon officers appointed by the executive and removable at his pleasure, with no patronage and no control of the purse or the sword, their power and influence rest solely upon

24. Fed.Rules Civ.Proc., rule 8(c), 28 U.S.C.A.

648

the public sense of the necessity for the existence of a tribunal to which all may appeal for the assertion and protection of rights guaranteed by the Constitution and by the laws of the land, and on the confidence reposed in the soundness of their decisions and the purity of their motives.

"From such a tribunal no well-founded fear can be entertained of injustice to the government, or of a purpose to obstruct or dominish its just authority." [25]

██ An order will be entered giving respondents five days within which to comply with the decree of the court, and directing them to submit themselves at the end of that time, if they have not then complied as directed in the order, for commitment as in civil contempt until they do comply.

25. United States v. Lee, 1882, 106 U.S. 196, 223, 1 S.C. 240, 263, 27 L.Ed. 171, 182.