**UNITED STATES of America**

v.

**Mark WEFERS, Individually and as President of Student Government of the University of New Hampshire.**

**Crim. A. No. 7027.**

United States District Court,
D. New Hampshire.
June 9, 1970.

from the University of Oregon Law School

**138**

David A. Brock, U. S. Atty., Concord, N. H., for plaintiff.

William P. Shea, Dover, N. H., for defendant.

## OPINION

BOWNES, District Judge.

This is a case of alleged criminal contempt arising from a speaking appearance on the campus of the University of New Hampshire by Abbie Hoffman, Jerry Rubin, and David Dellinger (commonly referred to in New Hampshire as the "Chicago 3") on Tuesday, May 5th, from approximately 7:40 P.M. to 10:30 P.M. The defendant, who is charged with willfully disobeying an order of this Court restricting the speaking appearance to between the hours of 3:30 P.M. and 6:30

P.M., is President of the Student Government of the University of New Hampshire.

## BACKGROUND

On March 25th, the defendant received a telegram from a person by the name of Robert Lamb, of Chicago, informing him that the so-called "Chicago 7" and their lawyers were available for lectures on college campuses. The defendant directed one of his assistants to send a telegram that same afternoon tentatively offering the sum of $5,000 for the "the nine of them" and generally expressing interest in some type of program. Negotiations between the defendant and Mr. Lamb eventually culminated in an agreement that Abbie Hoffman, Jerry Rubin, and David Dellinger would appear on the University of New Hampshire campus for the sum of $3,500 on Tuesday, May 5th, between the hours of 7:00 P.M. and 10:00 P.M. The date of April 28th was set initially, but was changed for the convenience of the speakers to May 4th, which was also changed to the final date of May 5th. The only time ever discussed between the defendant and the speakers' agent for the speaking appearance was 7:00 P.M. to 10:00 P.M. It is not clear just when the Trustees of the University were informed that the "Chicago 3" had been scheduled to speak on May 5th from 7:00 P.M. to 10:00 P.M., but the Trustees held a special meeting on Friday, May 1st, devoted solely to the appearance of the "Chicago 3" on the campus.

Between March 25th and May 1st, there was a great deal of public controversy throughout the state as to whether or not the "Chicago 3" should be allowed to speak at all. There were editorials and comments in many of the state's newspapers and there was an attempt by some members of the New Hampshire Legislature to absolutely forbid any speaking by the "Chicago 3" on the campus.

At the special meeting on May 1st, the Trustees voted to allow Messrs. Hoff-

man, Dellinger, and Rubin to speak on the campus of the University of New Hampshire, restricted, however, to between the hours of 2:00 P.M. and 5:00 P.M. on May 5, 1970. The reason given for the 2:00 P.M. to 5:00 P.M. restriction was the Trustees' fear of violence and their belief that the later the hour, the greater the chance of violence erupting on the campus.

## CIVIL PROCEEDINGS

On Monday afternoon, May 4th, a civil action entitled "Complaint and Request for Injunction by 5:00 P.M., May 5, 1970," was filed in the United States District Court for the District of New Hampshire by the defendant as President of the Student Government of the University of New Hampshire. Jurisdiction was invoked pursuant to Title 28 U.S.C. § 1343(3) (1964) and Title 42 U.S.C. § 1983 (1964). The complaint alleged that the students of the University of New Hampshire were being deprived of the rights guaranteed to them by the free speech and peaceable assembly clauses of the First Amendment to the Constitution of the United States. The defendant (plaintiff in the civil action) sought an injunction enjoining and restraining the Board of Trustees from enforcing its directive that the "Chicago 3" could speak only between the hours of 2:00 P.M. and 5:00 P.M. and sought an order granting him the right to schedule the appearance of Messrs. Hoffman, Rubin, and Dellinger on Tuesday from 5:00 P.M. until they finished speaking.[1]

A hearing was held on the civil action on Tuesday morning, May 5th, starting at 9:50 A.M. At the hearing the defendant made it clear that the original invitation to the "Chicago 3" had been issued on his own initiative and that he was in charge of all arrangements relative to their appearance. During the hearing, the defendant also stated that three hours was the total time required for full delivery of the speeches by these three men. After the hearing had been closed, the Court was informed that Attorney Millimet, the attorney for the Trustees, had some additional information for the Court. Attorney Millimet informed the Court that he had reliable information to the effect that all three speakers would arrive at Logan Airport at approximately 2:20 P.M. and that, therefore, all three could be on the campus of the University of New Hampshire by 3:30 that afternoon. The Court again asked the defendant if three hours was sufficient time for the speakers and he replied in the affirmative.

The Court then issued the order which has resulted in this contempt proceeding:

> The Board of Trustees of the University of New Hampshire are enjoined and restrained from enforcing their directive that Abbie Hoffman, David Dellinger and Jerry Rubin can speak at the University of New Hampshire only between the hours of 2:00 P.M. and 5:00 P.M. on Tuesday, May 5, 1970.
>
> It is further ordered that Abbie Hoffman, David Dellinger and Jerry Rubin shall be allowed to speak at the University of New Hampshire on Tuesday, May 5, 1970, between the hours of 3:30 P.M. and 6:30 P.M., Tuesday, May 5, 1970. So ordered.

## EVENTS AFTER HEARING

After the hearing was closed, defendant and his counsel, Mr. Shortlidge, re-

---

1. The relief sought in the civil action was that the Court:
   1. Enjoin and restrain prior to 5 P.M. on May 5, 1970 the Board of Trustees of the University of New Hampshire from enforcing its directive that Abbie Hoffman, David Dellinger and Jerry Rubin can speak at the University of New Hampshire only between the hours of 2 P.M. and 5 P.M. on May 5, 1970.

2. Issue an order granting the plaintiff the right to schedule the appearance of the said Abbie Hoffman, David Dellinger and Jerry Rubin, at the University of New Hampshire, on Tuesday, May 5, 1970, from 5:00 P.M. until they finish speaking.
3. Award such other and further relief as the Court deems just.

mained in the courthouse for about thirty minutes to obtain a copy of the order. It is clear from the testimony at the contempt trial that the defendant was not satisfied with the Court's order when and as issued because it did not give him the relief asked: the right to schedule the appearance of the speakers "from 5:00 P.M. until they finish speaking." Attorney Shortlidge advised the defendant at the courthouse that the order meant that unless the Trustees met again and prohibited any speaking after 5:00 o'clock the "Chicago 3" could speak after 6:30 P.M. without restriction. In the light of what had just transpired at the hearing (Appendix A), the Court was sure that the order was understood by both parties and that it would not unreasonably abridge the students' rights of free speech and assembly. Furthermore, neither the defndant nor his attorney attempted to ask the Court, either at the close of the hearing or before they left the courthouse, for a clarification of the order.

Before leaving the courthouse at about 12:30 P.M., the defendant called a Mrs. Carlene Harris who was in charge of the student marshals. The defendant, on cross-examination, stated emphatically that he did not tell Mrs. Harris to do anything, but it is significant that Mrs. Harris' husband was one of the two students who met the visiting speakers at Logan Airport at 2:20 P.M. that afternoon.

At approximately 1:00 o'clock, Dr. McConnell, President of the University, read the Court order to a group of students gathered at what was called at the trial the "T-Hall Rally" and told them that they would hear the "Chicago 3" at the Field House from 3:30 P.M. to 6:30 P.M. The defendant also addressed the same group shortly after the President and told them that "they are going to be in the Field House at 7:30 tonight, OK." Ex. 5.

Sometime between 2:20 P.M. and 2:30 P.M., the three speakers arrived at Logan Airport in Boston. They left the Airport between 2:30 P.M. and 2:40 P.M. with two students, Mr. Harris and a Mr. Scagliotti.

A phone call from Logan Airport was made to President McConnell's office for the defendant at approximately 2:30 P.M. Since the defendant was not immediately available, this call was taken by a Mr. Riviere, one of the defendant's assistants. Another phone call for the defendant was made to the President's office by Mr. Scagliotti at about 3:30 P.M. This call was taken by Mrs. Lambert, the President's secretary. There was no testimony as to where Mr. Scagliotti was when this call was made. Neither Mr. Scagliotti nor Mr. Harris were called to testify.

At approximately 3:45 P.M., the three speakers arrived in Dover, New Hampshire, which is less than ten miles from the University campus, and remained there basking in the sun on a lawn until about 5:10 P.M.

Sometime between 3:30 P.M. and 4:00 P.M., the defendant engaged in a three-way telephone conversation with his attorney, Mr. Shortlidge, and with Mr. Millimet, attorney for the Trustees. This telephone conversation accomplished nothing except to reveal the wide difference between Attorney Millimet's and Attorney Shortlidge's interpretation of the meaning and effect of the Court's order. The defendant testified that he told both attorneys that he would abide by any interpretation that could be agreed upon between them. Suffice it to say that no such agreement was reached.

Shortly after 4:00 o'clock, the defendant made a statement informing the students, who had filled the Field House to capacity, that the speakers were not going to speak until 7:30 P.M. Ex. 6. At this time, the defendant read to the crowd a note from the "Chicago 3" stating that they would speak at 7:30 P.M. and not earlier. Ex. B. The defendant had been informed by Mr. Harris, who delivered the note, that all three were serious about this and definitely would not speak any earlier than 7:30 P.M.

The Court accepts this as an accurate estimate of the "Chicago 3's" intent.

Sometime around 4:30 P.M., Attorney Millimet contacted the Court and informed him that there was a serious misunderstanding as to the meaning and effect of the order. The Court, thereupon, telephoned Attorney Shortlidge and learned, indeed, that the order had received a different interpretation than the one intended. After disabusing Attorney Shortlidge of his misinterpretation of the original order, the Court issued a supplemental order.[2] This order was read over the phone to Attorney Millimet, but the Court was unable to contact Attorney Shortlidge again by phone. Sometime around 5:30 P.M. the Court did contact Attorney Kfoury and read the order to him.[3] The supplemental order was served on President McConnell at approximately 6:45 P.M., and service was made on the defendant at approximately 6:55 P.M. There is a real question of fact as to whether or not the defendant deliberately failed to read this supplemental order, but the Court accepts as true his statement that he never understood it and never had an opportunity to read it. ⟨In any event, the supplemental order was issued too late to have any real effect.⟩

In the meantime, between 5:00 P.M. and 6:00 P.M., there was a meeting in the office of the Director of Athletics at the Field House, at which President McConnell, Fred Hall, Jr., President of the Board of Trustees, Senator Gilman, a member of the Board of Trustees, the Attorney General, and the Director of Safety were present. At that meeting it was decided that, because of the real possibility of violence if an attempt were made to prevent the "Chicago 3" from speaking after 6:30 P.M., there

would be no attempt to stop them from speaking at 7:30 P.M. Mr. Hall testified at the contempt trial "that it was the recommendation of the law enforcement people that the meeting be allowed to go on as originally scheduled."

At approximately 6:00 P.M., President McConnell issued a statement to the effect that, in the interests of safety, the University would make no affirmative attempt to prevent the "Chicago 3" from speaking at 7:30 P.M. He also stated that he felt that their speaking at that time would be a violation of the Court order.

At the trial, President McConnell testified that the speech probably could have been stopped by the use of force by security personnel present at the campus or available nearby, but that, in his opinion, the results might have been disastrous. The Court notes that all of these events occurred the day after the death of four students at Kent State University. The concern of the President and the other officials that violence might erupt reflected a realistic appraisal of the volatility of the campus that afternoon. While the dignity and authority of an order of a United States District Court should be upheld, if at all possible, that dignity and authority would indeed have a hollow ring if its order were upheld at the price of death or injury to anyone.

At approximately 7:40 P.M., Messrs. Hoffman, Rubin, and Dellinger were introduced by the defendant and the speeches started.

## RULINGS AND FINDINGS

There was no attempt by the defendant to comply with the order of this Court. When the defendant left the courthouse after the civil hearing, he

---

2.       SUPPLEMENTAL ORDER
   It has come to the Court's attention that its prior order issued this day may have been misconstrued or misinterpreted.
   The Court wishes to make it clear that its order means that Abbie Hoffman, David Dellinger, and Jerry Rubin shall not be allowed to speak at the Universi-

ty of New Hampshire on Tuesday, May 5, 1970, after 6:30 P.M., unless the Trustees otherwise allow.

3. Attorney Kfoury was co-counsel with Attorney Shortlidge for the defendant, but left the courthouse immediately after the hearing.

was determined that the speaking would not start before 7:30 P.M. The defendant's speech at the "T-Hall Rally" shortly after 1:00 o'clock, immediately following Dr. McConnell's statement that the speaking would be from 3:30 P.M. to 6:30 P.M., is clear evidence of this determination. Ex. 5.

While there may have been some ambiguity in the order, there is nothing in the order that even remotely suggests that the defendant had been given authority by the Court to schedule the appearance at 7:30 P.M. As a matter of fact, the defendant's prayer for relief in the civil action asked that he be allowed to schedule the appearance at 5:00 P.M.

■ The defendant invoked the jurisdiction of this Court as he had a right to do. He represented to the Court both in his pleadings and in his testimony in the civil action that he was in charge of the scheduling of the "Chicago 3." The defendant, therefore, had a duty to at least inform the "Chicago 3" of the Court's order, and request that they comply with it. If this had been done at any time prior to 3:30 P.M. and they had refused (and it appears from Exhibit B that such would have been the result) then, at least, a good faith attempt to comply would have been made and there would be no question of contempt.

■ The defendant, however, takes the anomalous position that he could not contact the speakers at all between the conclusion of the hearing and the time he introduced them at the Field House at 7:40 P.M. The Court, in order to accept this defense, would have to totally ignore the three telephone calls: The 12:30 P.M. call to Mrs. Harris, the 2:30 P.M. call from Logan Airport, and the 3:30 P.M. call from Mr. Scagliotti. The fact that the defendant did not himself actually receive the phone calls of 2:30 P.M. and 3:30 P.M. does not mean that he was unable to contact the speakers. Quite to the contrary, it evidences a studied effort on the part of the defendant to avoid any contact with them. The Court finds that the defendant could have communicated the Court's order to the speakers prior to 3:30 P.M., along with a request to comply with it; and that he deliberately failed to do so.

In connection with the defendant's assertion that he had no control over the time of speaking, the Court notes that the defendant stated emphatically with reference to the three-way phone conversation between himself and Attorneys Millimet and Shortlidge (between 3:30 P.M. and 4:00 P.M.), that he would abide by any interpretation to which the lawyers agreed. If the defendant meant this, then it follows that he either knew that no agreement would be reached or that he had some control over the speaking hours.

It is true that the defendant's speech at the Field House shortly after 4:00 P. M. suggests that he wanted the three to start speaking then, but by that time the die had been cast; he knew that the speakers would not appear before 7:30 P.M. Ex. B. The events that transpired after 4:00 o'clock have little bearing on the question of the defendant's contempt, except as they show his continued determination that the speeches not start before 7:30 P.M. regardless of the order of the Court. While the Court accepts as true the defendant's testimony that he attempted to avoid having the United States Marshal serve the supplemental order on him because he was afraid of being arrested, the Court must infer from this that the defendant was acutely aware that he had acted contrary to the order.

The evidence establishes beyond a reasonable doubt that between the hours of 12:00 Noon and 4:00 P.M. the defendant willfully and deliberately refused to make any attempt to comply with the order of this Court.

It has been suggested by the defendant, as well as others, that if he is guilty of contempt so is Dr. McConnell for not preventing the speeches. This completely ignores the fact that it was the defendant, not Dr. McConnell, who invoked the jurisdiction of this Court. It was the defendant, not Dr. McConnell,

who represented to the Court that he was in charge of the speakers' schedule. The defendant cannot now escape responsibility or place it on others because the order that was issued was not what he anticipated or wanted. Anyone invoking the equity jurisdiction of a Federal Court must be willing to accept the results or pay the consequences.

The defendant asserts, however, that he was not in contempt because the Trustees *allowed* the speakers to start at 6:30 P.M. within the terms of the supplemental order and, therefore, that his responsibility had terminated. This position assumes, of course, that there was some sort of action by the Trustees. The Court rules that the meeting of Dr. McConnell, Mr. Hall, and Senator Gilman with the Attorney General and the Director of Safety and their resulting decision not to actively prevent the speaking was the action of the Trustees. The question, therefore, is: Did the Trustees *allow* the speaking after 6:30 P.M.? The plain understanding of the meaning of "allow" is "to approve of" or "to sanction." It is clear that the Trustees neither approved of nor sanctioned the time of speaking. It is also clear that the Trustees present, as well as the officials in charge of security, felt that the speeches could be prevented only by the use of force. The decision that was made was to refrain from the use of force. The Court is of the opinion that the decision was wise and commendable. However, the necessity of making this decision was forced upon the Trustees by the defendant's initial determination not to comply with the Court's order. To say that the Trustees "allowed" the speaking in the sense of sanctioning or approving it, is as absurd as to say that a man being held up at pistol point sanctions or approves the taking of his wallet.

We now consider the troublesome question of the role of Attorney Shortlidge in the defendant's conduct. The defendant seeks to excuse his actions on the grounds that his attorney advised him that the speaking could go on at 7:30 P.M. unless the Trustees met and issued an order prohibiting it. There is little doubt that Attorney Shortlidge breached his duty as an officer of the court by not advising the defendant that there should be, at least, a good faith attempt to comply with the Court order. Mr. Shortlidge seems to have overlooked the fact that his duty as an officer of the court was not only to his client, but also to the administration of justice. At best, Attorney Shortlidge's advice can be characterized as based on a strained and highly technical interpretation of the original order. At worst, it appears to have been designed to abet the defendant in his determination that there would be no speaking before 7:30 P.M.

In any event, the law is clear that in a criminal contempt case reliance on the advice of counsel is not a defense, but may and should be considered in mitigation of punishment.[4]

The Court finds the defendant guilty of contempt of court. The Court has taken into consideration in arriving at its sentence the fact that the defendant, at least in part, may have relied on the advice of counsel.

4. See In re La Varre, 48 F.2d 216, 222 (S.D.Ga.1930) where the Court said: Citation of authority is unnecessary to establish the legal proposition that advice of counsel does not relieve of responsibility for criminal contempt. It may and properly does mitigate the punishment. The rule is wise for a number of reasons. No other need be cited than the possibility always that counsel is not fully acquainted with all the facts. Then, to, there is always the possibility that counsel may be willing to co-operate in defying the order of a court which is contrary to his advice and contention.
See also Taylor v. United States, 221 F.2d 809, 810 (6th Cir. 1955); In re Door, 90 U.S.App.D.C. 190, 195 F.2d 766, 770 (1952); United States v. Goldfarb, 167 F.2d 735 (2nd Cir. 1948); Eustace v. Lynch, 80 F.2d 652, 656 (9th Cir. 1935).

The sentence is:

Defendant shall pay a fine of five hundred dollars *or* be committed to jail for twenty days.

The fine shall be paid or the jail sentence shall begin the day after the expiration of the appeal period if no appeal is taken.

If an appeal is taken, sentence is deferred until final decision.

It has been suggested that the defendant has no funds to finance an appeal. If this is so, the Court will appoint counsel to prosecute the appeal.

So ordered.

### APPENDIX A

Transcript of the civil proceedings immediately prior to Court's order:

### AFTER RECESS

THE COURT: Mr. Millimet, I understand you have some additional statement or information, or something?

MR. MILLIMET: Yes, sir. As I stated in chambers this morning, our office has been making extensive efforts in behalf of the University to determine the facts about the availability of these three speakers, and I have just talked with a member of our firm who has been in contact with all three of the speakers. It has been arranged to meet them at the Boston airport at 2:20 this afternoon, and they will be on the campus by 3:20, available to make their speech within the hours specified. Now, it hasn't been possible to get them there by 2:00 o'clock in accordance with the earliest hour, and if the Court feels that some reasonable extension of the 5:00 o'clock deadline is within the Court's jurisdiction to order the University in view of the circumstances, I don't think we would object to it.

THE COURT: Well, have you spoken to the Trustees?

MR. MILLIMET: No, I haven't. I have spoken to the President, but I haven't spoken to the Trustees.

THE COURT: Are you at liberty to disclose what the President's view might be as to a reasonable extension?

MR. MILLIMET: The President feels very acutely his responsibility for the welfare of the students and the avoidance of violent confrontation. That's all I can say, Your Honor. I am not authorized to confess any judgments, so to speak. But I just bring it to your attention that our efforts have been— since the time limitation was placed by the Trustees, our efforts have been to avoid the confrontation, and that is why we have proceeded in this manner.

THE COURT: Well, the President is closer to the situation than I am. I don't know what authority he has as far as the deadline is concerned. As I understand it now, these gentlemen are scheduled to be in Boston at 2:30 this afternoon?

MR. MILLIMET: 2:20.

THE COURT: Well, 2:30. And that means that they will be in Durham, what is it, another hour?

MR. MILLIMET: Yes, sir.

THE COURT: 3:30.

MR. MILLIMET: I would just like to state further for the record that I believe the reason they have not been able to arrive sooner is a legitimate one, namely, that they were, at least one of them was engaged in a court proceeding in New York this morning, and it wasn't until sometime approximately now that they were able to determine that they would not have to stay in that court.

THE COURT: There was some testimony as to how long it was necessary for these gentlemen to speak.

MR. SHORTLIDGE: Three hours, Your Honor, I believe.

MR. MILLIMET: I hadn't heard any such testimony. I don't know where the three-hour time period came from, and I don't recall there was any testimony to that effect.

THE COURT: Well, I think the testimony was that Mr. Wefers said that it

was his opinion that three hours was long enough for, plenty of time for them to speak.

Is that correct?

MARK WEFERS: Yes, Your Honor.

THE COURT: Isn't that what you testified to?

MARK WEFERS: Yes.

THE COURT: All right, I am going to take another five minutes in the light of this latest information.

(Whereupon, at 11:45 o'clock, A.M., a short recess was taken.)

### AFTER RECESS

THE COURT: Well, I am not going into a lot of whys and wherefores, except to point out, of course, that one of our most treasured rights is the protection of free speech, and to point out further that free speech is to be given as full a rein as possible, unless compelling reasons are shown why there should be restraints and restrictions.

I am making the following order:

(Court Order.)

(Whereupon, at 11:55 o'clock, A.M., the above hearing was closed.)