294 S.E.2d 900

**STATE ex rel. Gary William WALKER**

v.

**Donald GIARDINA, Sheriff, etc., W. H. Gifft & Ray Boyd, etc.**

No. 15507.

Supreme Court of Appeals of West Virginia.

June 22, 1982.

Rehearing Denied Sept. 16, 1982.

Sprague W. Hazard, Martinsburg, for appellant.

Braun Hamstead, Pros. Atty. for Jefferson County, Charles Town, for appellees.

MILLER, Chief Justice:

This case is before us on a rule to show cause for contempt of this Court. The respondents are two deputy sheriffs, who were custodians of the Jefferson County Jail on the evening of February 9, 1982. The charge is made that they refused to obey a stay of order of this Court.

On November 22, 1981, Petitioner Gary William Walker was arrested on a fugitive warrant and incarcerated in the Jefferson County Jail from that date until February 9, 1982. On January 4, the petitioner submitted a petition in the Circuit Court of Jefferson County for a writ of habeas corpus in opposition to extradition proceedings brought against him by the State of Florida. The Circuit Court Judge, Pierre E. Dostert, conducted an evidentiary hearing on February 9, with the petitioner presenting evidence to controvert the facts contained in the fugitive warrant. The habeas corpus relief was denied.

A stay of execution for reasonable time in order to perfect an appeal to this Court was sought by the petitioner and denied by the trial court. Whereupon, pursuant to Rule 6(c) and 2 of the Rules of Appellate Procedure West Virginia Supreme Court of Appeals,[1] an application was made to this Court for a stay of execution. We granted a stay of execution and at 8:00 P.M. on February 9, the Clerk of this Court, George W. Singleton, telephonically informed one of the petitioner's jailors, Ray Boyd, that a

---

1. Rule 6(c) of the Rules of Appellate Procedure states:

"If the circuit court should refuse to grant a stay, or if the relief afforded is not acceptable the applicant may, upon written notice to the opposing party, apply to the Supreme Court for a stay. Such application shall show the reasons assigned by the circuit court for denying a stay or other relief, and further show the reasons for the relief requested and the grounds for the underlying appeal. If the facts are subject to dispute, the application shall be supported by affidavits or other sworn statements. Such parts of the record as are relevant shall be filed with the application."

Rule 6(c) parallels the provisions of W.Va.Code, 58-5-5, in regard to stay of proceedings by this Court.

Rule 2 provides:

"In the interest of expediting decision, or for other good cause shown, the Supreme Court may suspend the requirements or provisions of any of these rules in a particular case on application of a party or on its own motion and may order proceedings in accordance with its direction. These rules shall be construed to allow the Supreme Court to do substantial justice."

stay of execution had been granted by this Court. Mr. Singleton also telephoned the prosecuting attorney, Braun A. Hamstead, who subsequently verified the stay and that George W. Singleton was the Clerk of the West Virginia Supreme Court of Appeals to the other jailor, W. H. Gifft.

Jailor Gifft then informed Judge Dostert of the stay issued by this Court, and was instructed by Judge Dostert to ignore our stay order. At 9:00 P.M. on February 9 the petitioner was released to Florida officials who took the petitioner to Virginia and transported him to Florida the next day.

■ This petition was then brought which among other things sought a rule to show cause as against Jailors Gifft and Boyd to determine if they should be held in contempt of this Court for failing to obey the telephonically communicated order of this Court. We granted a rule to show cause returnable April 27, 1982.[2]

### I.

■ Jailors Boyd and Gifft clearly ignored our order for a stay of execution in the proceedings against the petitioner. In subsequent sworn depositions taken in this matter, they readily admit that they recognized the order and its legality and that they disobeyed it by turning over the prisoner to Florida officials. Therefore, they have admitted their contempt. They defend their action by claiming that they were instructed to ignore our order and turn the petitioner over by Circuit Court Judge Dostert. We do not recognize this as a valid defense as one is not excused for

2. The petition in this case which was docketed February 22, 1982, and numbered 15507, asserts several grounds of error: (1) the denial of the petitioner's right to bail or to release after being incarcerated in the Jefferson County Jail for a period in excess of thirty days on a fugitive warrant; (2) the trial court's error in finding the petitioner to have been present in the State of Florida on the date of the alleged offense; (3) the trial court's error in finding that the petitioner was the person named in the extradition papers; (4) the trial court's error in finding that a crime was committed on the date stated in the warrant; and, (5) the fact that Respondents, W. H. Gifft and Ray Boyd, are in contempt of the order for a stay of execution issued by this Court.

his disobeyance of a valid court order because someone told him not to obey it.

This principle of law has developed in the area of the attorney-client relationship where it has been held that the advice of counsel is not ordinarily a defense to contempt resulting from a willful disobedience of a lawful court order. *United States v. Seavers*, 472 F.2d 607 (6th Cir. 1973); *Sawyer v. Dollar*, 190 F.2d 623 (D.C.Cir.1951); *Becton, Dickinson and Company v. Food and Drug Administration*, 448 F.Supp. 776 (N.D.N.Y.1978); *United States v. Wefers*, 314 F.Supp. 137 (D.N.H.1970); *City of Vernon v. Superior Court*, 38 Cal.2d 509, 241 P.2d 243 (1952); *Alves v. Braintree*, 341 Mass. 6, 166 N.E.2d 720 (1960); 17 C.J.S. *Contempt* § 38 (1963 Ed.). Furthermore, an attorney is subject to punishment for instructing a client to disobey court order. *Sawyer v. Dollar, supra; In re Apfel*, 202 App.Div. 76, 195 N.Y.S. 325 (1922); 7 C.J.S. *Attorney and Client* § 83 (1980 Ed.).

In *Bailey v. Bailey*, 127 W.Va. 826, 829, 35 S.E.2d 81, 82–83 (1945), the contemnor, Bailey, sought to avoid contempt by asserting he had relied on advice of counsel in regard to making reduced alimony payments, but we said:

"The fact that Bailey may have been advised to the contrary and may have been told that the contract was not superseded by the decree but remained in effect, although it may mitigate the trial chancellor's pronouncement if he is found guilty of contempt, cannot otherwise affect the result."

We granted this petition in order to investigate the contempt issue as stated in the Order of the Clerk of this Court entered on February 24, 1982, and issued a rule to show cause directed to the respondents, Ray Boyd and W. H. Gifft, requiring them to appear before this Court at its courtroom in the City of Charleston, West Virginia, at ten o'clock a. m., on Tuesday, April 27, 1982, to show cause, if any, why they should not be adjudged in contempt of this Court for disobedience of its order. The respondents appeared and defended their action as subsequently developed in this opinion.

We do not consider the first four grounds of this petition because the petitioner is no longer within our jurisdiction.

*See also State ex rel. Mason v. Harper's Ferry Bridge Co.*, 16 W.Va. 864 (1879).

In *Sawyer v. Dollar, supra,* the United States Court of Appeals for the District of Columbia had determined that certain stock in a steamship company held by the Secretary of Commerce belonged to the shareholders of the company and ordered the share's to be delivered. The Secretary sought to rely on the Department of Justice's advice that he did not have to deliver the shares. The court, however, refused to relieve him of contempt for failing to deliver the stock certificates as ordered. Moreover, even his claim that he was acting on the advice of the President was of no avail.

"In the present case the courts have decided that the Commission and the Secretary did not and do not hold these shares on behalf of the United States as its agents. The court has power to enforce that judgment in so far as the Secretary and the members of the Commission are concerned. The executive branch of the Government has no power in the face of that judgment to decide that the Secretary does hold the shares as agent of the United States. To claim that the executive has such power is to claim the total independence of the executive from judicial determinations in justiciable cases and controversies. To characterize such judicial determinations as illegal coercion of the executive is to deny one of the fundamental concepts of our government." *Sawyer v. Dollar, supra* at 639.

The Secretary's final contention was that he had been found not in contempt and ordered to withhold the stock by a California court. The court rejected this claim stating:

"The decision of the California court that the respondents here were not in contempt there could not and did not foreclose this court from proceeding with the present contempt proceeding, and its judgment of no contempt is not res judicata here." *Sawyer v. Dollar, supra* at 634.

■ We have not been able to find a case where a trial court judge directed a party to disobey a stay order from an appellate court. We conclude however based on the foregoing authorities that a party may not disobey a lawful order of an appellate court because he has been advised to do so by a lower court.

## II.

■ The fact that our order was orally communicated by telephone rather than in writing is of no relevance since the parties involved were aware of the contents of the order and its authenticity. In *State v. Robertson,* 124 W.Va. 648, 22 S.E.2d 287 (1942), this Court issued a temporary injunction under W.Va.Code, 53–5–5, to prevent the convening of a nominating convention. The contemnors were persons who were active in bringing on the convention. Several of the parties attempted to avoid the contempt by urging that they had not been served with a copy of the order. This Court, however, found they had been given oral notice of the contents of the order by the sheriff and found them to be in contempt.

■ In *Hendershot · v. Handlan,* 162 W.Va. 175, 248 S.E.2d 273 (1978) we stated in Syllabus Points 1 and 2:

"1. A person, although not a party to a proceeding, may be charged with contempt for the violation of a court's order entered therein if he has actual knowledge of such order and is acting in concert or privity with a party.

"2. One may be charged with contempt for violating a court's order, of which he has actual knowledge, notwithstanding that at the time of the violation the order had not yet been formally drawn up."

There are any number of cases that support the foregoing law to the effect that the service of a written order is not an essential predicate to hold a person in contempt for violating the order provided he has reliable knowledge as to the contents of the order. *E.g., State v. Dunn,* 36 N.M. 258, 13 P.2d 557 (1932); *Belden v. Stott,* 150 Ohio St. 393, 83 N.E.2d 58 (1948); *Rollins v. Commonwealth,* 211 Va. 438, 177

S.E.2d 639 (1970); *State ex rel. Curtiss v. Erickson*, 66 Wash. 639, 120 P. 104 (1912).

The use of telephonically communicated orders ordinarily may not be necessary but obviously may become so, particularly on an appellate level where stays of execution of sentencing orders are granted. An obvious example is where a United States Supreme Court Justice in chambers grants a stay of execution to a death sentence only a short time before the sentence is to be executed. It is apparent that such stays are communicated without the necessity of delivering a written stay order. *E.g., Eckwerth v. New York*, 79 S.Ct. 755, 3 L.Ed.2d 830 (1959).

Of some relevance is the case of *United States v. Shipp*, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319 (1906) which involved a contempt petition charging that the sheriff and certain deputies of a state jail had committed contempt of the United States Supreme Court's order which stayed the execution of the state's death sentence. The stay order had been communicated by a telegram and contemnors then aided and permitted a mob to enter the jail, remove the prisoner, and lynch him. The Court disposed of certain procedural claims and was untroubled by the lack of a formal order being served on the contemnors.

At a later term, the Supreme Court subsequently reviewed the factual evidence submitted on the issues and concluded that as to six of the contemnors, one of whom was the Sheriff, Shipp, a contempt had occurred. Three other contemnors were found not liable and discharged. *United States v. Shipp*, 214 U.S. 386, 29 S.Ct. 637, 53 L.Ed. 1041 (1909). In a final memorandum opinion, *United States v. Shipp*, 215 U.S. 580, 30 S.Ct. 397, 54 L.Ed. 337 (1909), the Sheriff and two others were given a 90 day jail sentence and the other three a 60 day term.

We conclude that the stay order telephonically transmitted to the respondents was sufficient once its authenticity and contents are acknowledged. To hold otherwise would emasculate the ability of this Court to issue stay orders and would invite parties to exercise immediate self-help once an unstayed judgment is obtained in the lower court. Such a practice would disrupt the orderly process of appeal.

### III.

■ We have traditionally held, as have other courts,[3] that this Court possesses the power to punish a party for contempt of an order executed by this Court. In *State ex rel. Mason, supra*, in Syllabus Point 3 we spoke of our contempt power as:

"The Supreme Court of Appeals may punish a party summarily for such a contempt. Its right to do so is inherent and essential to the existence of the court; and the discretion involved in this power is in a great measure arbitrary and undefinable, and for a contempt of this character it has been in no degree restricted by our statute-law. This court may order, that that which has been done in disobedience of its lawful process shall be undone, where justice to any person requires this course to be adopted. When the contempt is willful, it may imprison the party; and when merely inadvertent and reckless, it may impose a fine on the party. If a fine be imposed, the court may imprison the party, if such fine be not paid in the time prescribed by the court."

See also *State v. Frew & Hart*, 24 W.Va. 416 (1884); *Hutton v. Lockridge*, 21 W.Va. 254 (1883).

*State ex rel. Mason, supra*, is somewhat analogous to our present case in that we had issued a supersedeas which had the effect of reinstating the lower court's injunction. The contemnor proceeded to ignore the supersedeas and a rule to show cause was then issued. He was found to be in contempt and fined.

---

**3.** *E.g., United States v. Shipp*, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319 (1906); *Howard v. State*, 28 Ariz. 433, 237 P. 203 (1925); *Bloniarz v. Roloson*, 70 Cal.2d 143, 74 Cal.Rptr. 285, 449 P.2d 221 (1969); *Young v. Knight*, 329 S.W.2d 195, 77 A.L.R.2d 994 (Ky.1959); *People v. Matish*, 384 Mich. 568, 184 N.W.2d 915 (1971); *State v. American-News Co.*, 62 S.D. 456, 253 N.W. 492 (1934); 17 C.J.S. *Contempt* § 44 (1963).

In *State v. Robertson, supra,* we issued a temporary injunction under W.Va.Code, 53–5–5, to prevent the holding of a nominating convention. The alleged contemnors were persons who were active in violating this court's injunction by holding the convention. We stated:

"The far reaching importance of the question presented cannot well be magnified. So far as we know, this is the first instance in the history of this state where an order of this Court has been openly disregarded and disobeyed, and affirmative action taken in an attempt to nullify and make the same ineffective... The attack upon the Court, as such, is the broad issue presented. If men may take the law in their own hands, in defiance of the processes of the highest court in our judicial system, then of what force and effect are the decrees, orders and processes of any court, and what becomes of the power vested in courts under our constitution and laws enacted thereunder?" 124 W.Va. at 649–50, 22 S.E.2d at 290.

While the cases relating to contempt of this Court have spoken generally of our contempt power, we have in dealing with contempt powers of the circuit court attempted to distinguish between civil and criminal contempt. Our latest case in this area is *State ex rel. Robinson v. Michael,* 164 W.Va. 190, 276 S.E.2d 812 (1981) where we reviewed in some detail our prior contempt cases and concluded in Syllabus Point 1:

"Whether a contempt is classified as civil or criminal does not depend upon the act constituting such contempt because such act may provide the basis for either a civil or criminal contempt action. Instead, whether a contempt is civil or criminal depends upon the purpose to be served by imposing a sanction for the contempt and such purpose also determines the type of sanction which is appropriate."

We continued to emphasize the ultimate purpose to be served by the contempt sanction and particularly the type of sanctions appropriate to civil and criminal contempt and in Syllabus Point 4 stated:

"Where the purpose to be served by imposing a sanction for contempt is to punish the contemner for an affront to the dignity or authority of the court, or to preserve or restore order in the court or respect for the court, the contempt is criminal." *State ex rel. Robinson, supra.*

We also summarized in *State ex rel. Robinson* our early case of *Hendershot v. Hendershot,* 164 W.Va. 190, 263 S.E.2d 90 (1980) by stating:

"*Hendershot* does not stand for the proposition that all contempts are to be treated as crimes and it did not abolish civil contempt. We were very careful in *Hendershot* to note that the holding of the case—that a jury trial is required in an indirect criminal contempt case—does not apply to a civil contempt case where the purpose is not punishment and the contemner is given a chance to purge the contempt." (Footnotes omitted) *State ex rel. Robinson, supra* at 817–18.

*Hendershot v. Hendershot's* principle holding was that "when a jail sentence is imposed and the contemnor is given no opportunity in the sentencing order for immediate release by purging himself of contempt by doing an act which is within his power to accomplish" then such sentence cannot be imposed without a jury trial. Syllabus Point 1 in part, *Hendershot v. Hendershot, supra.* This type of criminal contempt sentence had been earlier identified in Syllabus Point 10 of *Eastern Associated Coal Corp. v. Doe,* 159 W.Va. 200, 220 S.E.2d 672 (1975); "Whenever a defendant is sentenced to jail for a definite period of time for having failed to obey a court order, the contempt is criminal and not civil." *See also Floyd v. Watson,* 163 W.Va. 65, 254 S.E.2d 687 (1979).

In *State ex rel. Robinson, supra,* the focus was on the prospective nature of the sanction to be imposed. This resulted from *Hendershot v. Hendershot's* requirement of a right to a jury trial where a determinate jail sentence is contemplated. If a determinate sentence is intended to be imposed without the ability for immediate release by a right to purge oneself of the

contempt, a court contemplating the imposition of such a sentence would have to impanel a jury to try the case. Also recognized in *State ex rel. Robinson, supra,* was the usefulness of formulating some general rules that might assist judges in determining whether to proceed by way of civil or criminal contempt. Of particular importance to the present case is Syllabus Point 4 as previously stated and Syllabus Point 5 of *State ex rel. Robinson*:

"The appropriate sanction in a criminal contempt case is an order sentencing the contemner to a definite term of imprisonment or an order requiring the contemner to pay a fine in a determined amount."

■ The events in the present case clearly constitute acts of criminal contempt in that they were directed against the stay order of this Court. As in the case of *United States v. Shipp,* 214 U.S. 386, 29 S.Ct. 637, 53 L.Ed. 1041 (1909), there is no relief that can be accorded to the other party since the petitioner has now been removed beyond the jurisdiction of this Court.

We have stated in the earlier portion of this opinion that the contemnors could not escape liability for contempt by asserting that they were advised to ignore our order by Judge Dostert. Our conclusion is supported by *United States v. Shipp,* 214 U.S. 386, 29 S.Ct. 637, 53 L.Ed. 1041 (1909), and other cases holding that a stay of execution is directed at the Sheriff or other person having the custody of the defendant. *Llerandi v. Blackburn,* 97 So.2d 247 (Fla.1957); *Hames v. Sturdivant,* 181 Ga. 472, 182 S.E. 601 (1935); *State ex rel. Nemec v. Sheriff of Hennepin County,* 148 Minn. 484, 181 N.W. 640 (1921); *see* Annot., 63 A.L.R. 1460 (1929), supplemented by Annot., 143 A.L.R. 1354 (1943). The contemnors were obligated to uphold the stay order as public officials—their oath required no less. Candor compels us to acknowledge that in determining the type of sanction that should be imposed, we recognize that testimony was given by Jailor Gifft to the effect that he was threatened with contempt by Judge Dostert, if he enforced our order.[4] This fact was also communicated by Gifft to the other jailor, Boyd.[5] We have recognized in Syllabus Point 4 of *State ex rel. Mason, supra,* that while the disobedience of a court order based on advice of counsel is not a defense

---

**4.** In the deposition taken on April 12, 1982, Jailor Gifft testified:

"A. So, then I set there for about five (5) minutes and I thought I might be doing wrong so I called the judge.

"Q. Now, who's the judge?

"A. Dostert.

"Q. Dostert, alright.

"A. I called Judge Dostert and he said his orders ruled and if we refused to obey his orders we would be held in contempt by his court.

"Q. What would be the result of being held in contempt by Judge Dostert?

"A. We would be locked up in our own jail.

"Q. Was that made pretty clear to you by Judge Dostert?

"A. Yes, sir.

"Q. Did you explain to Judge Dostert that the call had been received from George Singleton?

"A. I explained we received a call from a man that said he was George Singleton.

"Q. Did you explain to Judge Dostert that Braun Hamstead had called you and told you that that was, in fact, George Singleton?

"A. Yes, sir."

**5.** In the deposition taken on April 12, 1982, Jailor Boyd testified:

"Q. At anytime after Judge Dostert was first notified by Wallace Gifft, did you have any reason to believe that if you did not obey the order of Judge Dostert that Judge Dostert could hold you in contempt and put you in your own jail?

"A. Yes, I did.

"Q. Was that said directly to you by Wallace Gifft or by the judge?

"A. By Wallace Gifft.

"Q. What was the gist of his conversation to you on that morning?

"A. Excuse me, I don't understand.

"Q. Okay, what was the substance of his conversation to you that morning about you being put in jail as best you remember?

"A. I asked Wally, 'what shall we do.' He said, 'We have to turn them loose or we're going to be held in contempt of Circuit Court.'

"Q. Which means what? Being held in contempt means what to you? Did he tell you what that would mean?

"A. Not obeying orders.

"Q. Okay, and what would be the result of being held in contempt?

"A. Locked up in our own jail."

to a contempt charge, it may be considered in determining the degree of punishment. *See Bailey v. Bailey, supra*; 17 C.J.S. *Contempt* § 38 (1963 Ed.).

At the time of the full hearing on the contempt, this Court had not had an opportunity to review the deposition in detail nor was any argument made in connection with the type of punishment that should be meted to the contemnors. The contemnors, as we have previously noted, have admitted their contempt. Therefore, the only issue that remains is the punishment question. We reserve ruling on this issue until a later time and will direct our clerk to reset this question of the punishment at a date in the next term of this Court with appropriate notice to the contemnors.

## IV.

We now turn to the question of Judge Dostert's actions. We have previously set out the deposition testimony of Jailor Gifft to the effect that after acquainting Judge Dostert with our stay order he was advised by the Judge to ignore the order and if he did not, Judge Dostert would hold him in contempt of his order. Judge Dostert's admonition appears to be a willful and direct interference with our order. Such an interference if proven would constitute a contempt which is criminal in nature as we have previously outlined in Syllabus Point 4 of *State ex rel. Robinson, supra.*

█ We recognize that *Hendershot v. Hendershot, supra,* mandates a jury trial where a criminal contempt is involved and there is the possibility of a determinate jail sentence. While *Hendershot v. Hendershot, supra,* dealt with a criminal contempt in a circuit court, its rationale for a jury trial was constitutionally based, and, therefore, must be deemed to impose a similar limitation on our criminal contempt power. We also recognize that this Court has no means of impaneling a jury nor any mechanism for prosecutorial service. The lack of such however should not diminish this Court's ability to fashion an appropriate remedy to have those who willfully violate our orders punished by way of a criminal contempt procedure.

█ Traditionally recognized in the area of contempt is that the situs of the contempt hearing is the place where the court sits that issued the order even though the acts of contempt may have been committed elsewhere. *Leman v. Krentler-Arnold Hinge Co.,* 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389 (1932); *Sawyer v. Dollar, supra; Theriault v. Carlson,* 353 F.Supp. 1061 (N.D.Ga.1971), *rev. on other grounds,* 495 F.2d 390 (5th Cir.1971), *reh. denied* 498 F.2d 1402, *cert. denied,* 419 U.S. 1003, 95 S.Ct. 323, 42 L.Ed.2d 279, *on remand,* 391 F.Supp. 578 (D.C.Ga.1973); *Whippany Paperboard Co. v. Local No. 301, United Paper Workers of America, C. I. O.,* 11 N.J. 153, 93 A.2d 349 (1952); 17 C.J.S. *Contempt* § 65 (1963 Ed.). While we have not had occasion to make this explicit point, it is clear from our prior cases that this Court has punished for contempts at the site of this Court even though the contemptuous acts occurred in another county. *State ex rel. Mason, supra,* (Jefferson County); *Hutton v. Lockridge, supra,* (Pocahontas County); *State v. Frew & Hart, supra,* (Ohio County). Consequently, we conclude that the appropriate forum for a criminal contempt of this Court is in Kanawha County before a circuit judge who will be designated by the mandate of this Court.

█ We also observe that with the sworn deposition testimony of Jailor Gifft there is sufficient probable cause to warrant the issuance of a rule to show cause. In this regard, our prior case law requires adequate notice of the contempt charge. *State ex rel. Hoosier Engineering Co. v. Thornton,* 137 W.Va. 230, 72 S.E.2d 203 (1952); *Ex parte Mylius,* 61 W.Va. 405, 56 S.E. 602 (1907). It is recognized in the area of a criminal contempt a court may initiate a criminal contempt proceeding. *MacNeil v. United States,* 236 F.2d 149 (1st Cir. 1956) *cert. denied,* 352 U.S. 912, 77 S.Ct. 150, 1 L.Ed.2d 119; *In re Fletcher,* 216 F.2d 915 (4th Cir. 1954) *cert. denied,* 348 U.S. 931, 75 S.Ct. 347, 99 L.Ed. 730 (1955); *Palmigiano v. Garrahy,* 448 F.Supp. 659 (D.C.R.I.1978); *Whippany Paperboard Co. v. Local No. 301, United Paper Workers of America, C. I. O., supra; Osborne v. Pur-*

*dome*, 244 S.W.2d 1005 (Mo.1951). We conceive, however, that while this permits a court to take some formal action to initiate a criminal contempt, if a determinate jail sentence is to be imposed, then a jury trial is necessary and at this point the criminal contempt proceeding is tried like an ordinary criminal trial.[6]

 This would mean that the prosecuting attorney would proceed to try the criminal contempt.[7] In *State ex rel. Robinson, supra*, we held that a prosecuting attorney could not be compelled by mandamus to prosecute a civil contempt. The contempt in *State ex rel. Robinson* arose from the former husband's failure to pay court ordered alimony. In the present situation this Court seeks vindication of its order by way of a criminal contempt and such action is independent of the wishes of any party to the litigation. There is authority elsewhere for a court's right to utilize the services of the prosecuting attorney to handle a criminal contempt proceeding. *E.g., Allison v. State*, 243 Ind. 489, 187 N.E.2d 565 (1963); *Osborne v. Purdome, supra; In re Buehner*, 50 N.J. 501, 236 A.2d 592 (1967); *Whippany Paperboard Co. v. Local No. 301, United Paper Workers of America, C. I. O., supra; In re Curtis' Petition*, 240 F.Supp. 475 (E.D.Mo.

1965); 17 C.J.S. *Contempt* § 63 (1963 Ed.). In this jurisdiction there is a duty on the prosecuting attorney to initiate criminal proceedings. W.Va.Code, 7–4–1. We conclude that when a court has reliable information that there has been a deliberate violation of its order by a person having knowledge of its order, the court may in its discretion initiate a criminal contempt proceeding through the prosecuting attorney of the county where the court sits and from which its order issued.

 Finally, we would note that the fact that Judge Dostert is a judge does not immunize him from a criminal contempt proceeding. The general rule elsewhere is that a judge may not avoid a criminal contempt proceeding by claiming judicial immunity. *In re Fite*, 11 Ga.App. 665, 76 S.E. 397 (1912); *McFarland v. State*, 172 Neb. 251, 109 N.W.2d 397 (1961); *In re Pagliughi*, 39 N.J. 517, 189 A.2d 218 (1963); *In re Mattera*, 34 N.J. 259, 168 A.2d 38 (1961);[8] 46 Am.Jur.2d *Judges* § 85 (1969 ed.).

For the foregoing reasons the contempt proceeding will be continued to the September 1982 Term of this Court as to Jailors Gifft and Boyd. As to Judge Dostert this matter is remanded to the Circuit Court of

---

**6.** As pointed out in *Hendershot v. Hendershot, supra*, and reaffirmed in *State ex rel. Robinson, supra*, if the sanction for the criminal contempt is a fine then a jury trial is not required.

**7.** A court may as an alternative to issuing a rule to show cause in a criminal contempt proceeding have the prosecutor utilize a summons under Rule 4 of the West Virginia Rules of Criminal Procedure since a criminal contempt is in the nature of a misdemeanor. Such summons could also be brought before a circuit judge for execution and issuance under W.Va.Code, 62–1–10. *See State ex rel. Burdette v. Scott*, 163 W.Va. 705, 259 S.E.2d 626 (1979). If an alleged contemnor does not appear in response to a rule to show cause or summons, a warrant for arrest or an attachment can be issued. In certain circumstances the warrant for arrest or attachment can be initially issued. *See Hendershot v. Handlan, supra* at 282–84 (Miller, J., concurring).

**8.** Chief Justice Weintraub in *In re Mattera*, 34 N.J. at 273, 168 A.2d at 45, traces the right of a superior court to punish a lower court for direct disobedience of its order to its English sources:

"There can be no doubt that a judge of an inferior court may be attached for disobedience of a direct order of a superior court. *State v. Hunt*, 1 N.J.L. 287 (Sup.Ct.1795). Blackstone (Book IV, p. 284) states the principal instances usually punished by attachment included:

" '1. Those committed by inferior judges and magistrates; by acting unjustly, oppressively or irregularly, in administering those portions of justice which are intrusted to their distribution: or by disobeying the king's writs issuing out of the superior courts, by proceeding in a cause after it is put a stop to or removed by writ of prohibition, *certiorari*, error, *supersedeas* (a command to stay or forbear doing that which ought not to be done), and the like. For, as the king's superior courts, and especially the court of king's bench, have a general superintendence over all inferior jurisdictions, any corrupt or iniquitous practices of subordinate judges are contempts of that superintending authority whose duty it is to keep them within the bounds of justice.' "

Kanawha County for further proceedings consistent with this opinion.

Continued, in part, and Remanded, in part